George Albert **WILLIAMS**, Appellant,

v.

**DISTRICT OF COLUMBIA**, Appellee.

No. 20927.

United States Court of Appeals District of Columbia Circuit.

Reargued Nov. 6, 1968.

Decided June 20, 1969.

---

Danaher, Circuit Judge, Wilbur K. Miller, Senior Circuit Judge, and Tamm and Burger, Circuit Judges, dissented.

John E. Vanderstar, Washington, D. C., with whom Ralph J. Temple, Washington, D. C., was on the brief, for appellant. Glen O. Robinson, Washington, D. C., also entered an appearance for appellant.

David P. Sutton, Asst. Corp. Counsel for the District of Columbia, with whom Charles T. Duncan, Corp. Counsel, Hubert B. Pair, Principal Asst. Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, were on the brief, for appellee.

Before BAZELON, Chief Judge, WILBUR K. MILLER, Senior Circuit Judge, DANAHER,* BURGER, WRIGHT, McGOWAN, TAMM, LEVENTHAL, and ROBINSON, Circuit Judges, sitting *en banc*.

---

* Circuit Judge Danaher became Senior Circuit Judge on January 23, 1969.

McGOWAN, Circuit Judge:

This is an appeal, by leave of this court, from an affirmance by the District of Columbia Court of Appeals, 227 A.2d 60 (1967), of a conviction in the Court of General Sessions for the use in a public street of "profane language, indecent and obscene words" in violation of 22 D.C.Code § 1107 (1967)—a disorderly conduct statute which has remained virtually unchanged since 1898. A division of this court first heard the matter and, with one judge dissenting, affirmed, although only after attributing to the trial court a construction of the statute more restrictive than that thought necessary by the D.C. Court of Appeals. Because the statute is not one this court has construed before, and because of doubts as to the basis upon which appellant was charged and tried, consideration of the case *en banc* was deemed appropriate.

We find that a narrower reading of the statute than that given by the D.C. Court of Appeals would be essential to its valid application. This construction of the statute, in turn, would render fatally defective the information filed against appellant, necessitating the vacation of appellant's conviction and the dismissal of the charge filed against him.

I

When Sir Robert Peel first entered the British Cabinet as Home Secretary, two of his most urgent goals were police reform and law reform—in that order. His experience in office did not alter his estimate of the importance of these objectives, but it did cause him to reverse the order of their accomplishment; and his achievements in police reorganization and training came largely during his eventual Prime Ministership. It is said that he speedily learned that good police performance is highly dependent upon the existence of rationally conceived and clearly formulated criminal statutes.

The President's Commission on Crime in the District of Columbia has drawn the same moral, and one of its principal targets was the archiac sections of the D.C.Code relating to disorderly conduct. After noting the many thousands of disorderly conduct charges made each year by the Metropolitan Police, the Commission said that "[c]lose examination of these provisions is appropriate because of their pervasive impact on police-community relations and their vulnerability to constitutional challenge." The Commission went on to note the growing involvement of this court with these statutes, and it asserted that "legal as well as practical considerations suggest that review of the two disorderly conduct statutes would not only be timely but may become essential." [1] The Commission remarked that instructive models for this effort were readily at hand in the American Law Institute's Model Penal Code [2] and certain newly-revised state codes. [3]

A key recommendation of the President's Commission was that "Congress enact legislation creating a Commission to revise and reform the criminal laws of the District of Columbia." This proposal rested upon the Commission's considered judgment that Code revision would "help to define criminal behavior more clearly, assist police, prosecutors and judges, and increase the deterrent and rehabilitative impact of the criminal law." The Congress created such a revising committee in 1967,[4] and its members were appointed. The law authorized an appropriation to enable the new commission to do its work, in an amount not to exceed $150,000—a sum equivalent to the reputed current cost of three B-52 bombing sorties.[5] No appropriation has

1. President's Commission on Crime in the District of Columbia, Report 632–33 (1966).

2. *See* Model Penal Code § 250 (Proposed Official Draft, 1962).

3. *See, e. g.*, 38 Ill.Stat.Ann. § 26-1 (1964).

4. 81 Stat. 742 (1967).

5. "A sortie is one round-trip by one B-52 carrying 25 tons of bombs. One such flight costs roughly $50,000—half for the bombs, the remainder for fuel and other operating expense." N.Y. Times, April 13, 1969, p. 6, col. 1.

as yet been made, although it is not clear whether the failure of initiative has been in Congress or the executive.

This promising project has, accordingly, not gotten off the ground; and police, prosecutors, and courts continue to try to enforce a 71-year old disorderly conduct statute which was not at its birth a model of craftsmanlike drafting and which has certainly not improved with age.

## II

The information filed against appellant in General Sessions Court consisted of a catch-all printed form, with lines drawn through the inapplicable parts and the blank spaces filled in with appropriate information. It alleges that appellant, on November 6, 1965, and in front of 2714 14th St., N.W.,

"did then and there use profane language, indecent and obscene words and under circumstances such that a breach of the peace may be occasioned thereby, did congregate with others on a public street and did refuse to move on when ordered by the police. * *"

Although these allegations are not keyed in the information to any specific statute,[6] it is conceded that the prosecution purported to be proceeding under two separate sections of Title 22 of the Code, namely, Section 1107 [7] and 1121, [8]

---

6. These awkward and barely comprehensible printed forms have been criticized by this court before. See Feeley v. District of Columbia, 128 U.S.App.D.C. 258, 387 F.2d 216 (1967); Jalbert v. District of Columbia, 128 U.S.App.D.C. 275, 387 F.2d 233 (1967). As Judge Prettyman said in Feeley, supra, 128 U.S.App.D.C. at 261-262, 387 F.2d at 219-220 defendants are

"entitled to know with some precision what law they had allegedly violated. Perhaps this is miniscule, but, when the Congress enacts laws describing criminal offenses in intricate patterns and with apparent variations in details, we think enforcement officers must be correspondingly exact. We think * * * defendants could not be required to select from the maze of small statutes here potentially applicable the course probably to be chosen by the prosecutor."

7. 22 D.C.Code § 1107 (1967) provides:
It shall not be lawful for any person or persons within the District of Columbia to congregate and assemble in any street, avenue, alley, road, or highway, or in or around any public building or inclosure, or any park or reservation, or at the entrance of any private building or inclosure, and engage in loud and boisterous talking or other disorderly conduct, or to insult or make rude or obscene gestures or comments or observations on persons passing by, or in their hearing, or to crowd, obstruct, or incommode, the free use of any such street, avenue, alley, road, highway, or any of the foot pavements thereof, or the free entrance into any public or private building or inclosure;

it shall not be lawful for any person or persons to curse, swear, or make use of any profane language or indecent or obscene words, or engage in any disorderly conduct in any street, avenue, alley, road, highway, public park or inclosure, public building, church, or assembly room, or in any other public place, or in any place wherefrom the same may be heard in any street, avenue, alley, road, highway, public park or inclosure, or other building, or in any premises other than those where the offense was committed, under a penalty of not more than $250 or imprisonment for not more than ninety days, or both for each and every such offense.

8. 22 D.C.Code § 1121 (1967) provides:
Whoever, with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby—
(1) acts in such a manner as to annoy, disturb, interfere with, obstruct, or be offensive to others;
(2) congregates with others on a public street and refuses to move on when ordered by the police;
(3) shouts or makes a noise either outside or inside a building during the nighttime to the annoyance or disturbance of any considerable number of persons;
(4) interferes with any person in any place by jostling against such person or unnecessarily crowding him or by placing a hand in the proximity of such person's pocketbook, or handbag; or
(5) causes a disturbance in any streetcar, railroad car, omnibus, or other public conveyance, by running through it, climbing through windows

each of which is quoted in full in the margin. The alleged use of "profane language, indecent and obscene words" is thought to violate Section 1107, while the charge of congregating and refusing to move on under circumstances such that a breach of the peace may be occasioned is bottomed upon Section 1121(2).

Although the record indicates that a reporter was present at the trial before the General Sessions Court sitting without jury, the D.C. Court of Appeals refused appellant's request to have a transcript prepared at public expense.[9] Appellant, with new counsel who was not present at the trial, was therefore obliged to proceed on a "Statement of Proceedings and Evidence" signed by the trial judge some four and one-half months after the trial had occurred. This statement described the testimony as being to the effect set forth below.

The prosecution's first witness was a police officer (Freto) who testified that at about 7:30 P.M., on November 6, 1965, he and his police partner (Bizeub) were walking south in the 2700 block of 14th Street, N.W. It was Saturday night, the area was generally congested, and the sidewalks were crowded. In front of a laundromat at 2742 14th Street, the officers saw appellant and four other men standing in a semi-circle. Although the sidewalk was said to be about 13 or 14 feet wide, Officer Freto said that the men were blocking the flow of pedestrian traffic on the sidewalk, and that he and his partner had to walk around the group of men. Therefore, before continuing south on 14th Street, the officer told the men to move on. After advancing some 200 to 300 feet further down the street, Officer Freto noticed that the five men had disobeyed his order and had not dispersed. The officers therefore backtracked, and again told the men they were blocking traffic and would have to move.

All but appellant obeyed the command. He, according to Officer Freto, said that he was not going anywhere, and that "no God damn policeman" could make him move, for he was the manager of the laundromat in front of which he was standing. The officer testified that he replied that the sidewalk was no place to conduct business, and that he again told appellant that he was violating the law by not moving. Appellant then said that "no son of a bitch" was going to make him move.

According to the officer, two of appellant's companions, who had previously moved away, returned at this point and asked appellant to join them; and appellant's wife, who had been inside the laundromat, came outside and also asked him to move. Appellant continued to refuse, but did move in the direction of the laundromat. When about three or four feet from the laundromat, but while still on the sidewalk, he said to the officer: "I dare you to lock my God damn ass up." The officer at this point took hold of appellant to arrest him. Appellant proceeded into the laundromat, however, and a minor scuffle ensued between him and the two officers, after which he was taken into custody. Officer Freto acknowledged, apparently on cross-examination, that he was aware that as a result of this incident a complaint to the police department had been made against him.

The testimony of the second policeman substantially confirmed that of his colleague. He, in addition, stated that appellant had been loud and boisterous, and had at one point stated that "no God damn rookie" was going to make him

---

or upon the seats, or otherwise annoying passengers or employees,
shall be fined not more than $250 or imprisoned not more than ninety days, or both.

**9.** We do not find it necessary, for the disposition of this appeal, to examine the claim that there was error in not providing appellant, who is an indigent, with a transcript. It should be pointed out, however, that it is next to impossible to resolve difficult issues involving the substantiality of evidence without such a transcript.

move. Officer Bizeub denied using a stick or blackjack, and said that the officers had not injured appellant in the scuffle.

At this point in the trial, the Government rested its case. The trial court, on the basis of Shuttlesworth v. City of Birmingham, 382 U.S. 87, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965), granted appellant's motion to dismiss as to the refusal to move on charge under Section 1121, but the trial continued on the obscene language count under Section 1107. In defense, three witnesses, including appellant's wife testified that they had seen the policeman push appellant after hearing the policeman order him to move on. Each said that he had heard no profane words. Appellant, who took the stand, denied uttering any profane words. The trial court found the appellant guilty of violation Section 1107,[10] but suspended imposition of sentence.

### III

Affirming the conviction, the D.C. Court of Appeals wrote:

> Appellant also maintains that the qualifying language of § 22–1121, the general disorderly conduct statute—"under circumstances such that a breach of the peace may be occasioned thereby"—must be read also into § 22–1107. We do not agree. § 22–1107 contains no provision making a consequential or probable breach of the peace an element of an offense under that section. As applicable here, it simply provides that it is unlawful "to * * * use profane language * * * in any place wherefrom the same may be heard." When the charge against appellant under § 22–1121 was dismissed under the authority of *Shuttlesworth* there was removed the need for the trial judge to find from the evidence presented that a breach of the peace was theatened by appellant's offensive language.

227 A.2d at 62. The court then went on to hold that, although there were good reasons to require a showing of relationship to a breach of the peace under the general disorderly conduct statute (Section 1121) in order to avoid First Amendment problems, there was no such need in respect of Section 1107, since "[p]rofane language has never been entitled to protection under the First Amendment." 227 A.2d at 63.

The construction so placed upon Section 1107 by the D.C. Court of Appeals did not appear to be the critical factor to the majority of the division of this court which first heard the appeal. In affirming, it said that

> taking the statute *as applied to Appellant,* we need not consider the punishment of words which have no tendency to provoke a breach of the peace. It is true that the District of Columbia Court of Appeals determined that there is no need to find a tendency to a breach of the peace under section 1107. 227 A.2d at 62. But both the information and the trial court's statement described the charge for which appellant was convicted as the "use of 'profane, indecent and obscene words' under circumstances such that a breach of peace may be occasioned." Since the conviction is for this charge, we find no constitutional defect in the statute as applied to Appellant. And we have no occasion to consider whether the statute may be constitutionally applied in' cases where there is no tendency to a breach of the peace.

(Emphasis in original.) Citing Chaplinsky v. New Hampshire, where the Supreme Court upheld a conviction under "a statute narrowly drawn and limited to define and punish * * * the use in a public place of words likely to cause a breach of the peace," 315 U.S. at 568, 573, 62 S.Ct. at 766, 770, 86 L.Ed. 1031 (1942), the division went on to find that

---

10. The judgment, dated December 29, 1965, read as follows: "Motion to dismiss count charging failure to move heard and granted. Motion denied as to count charging use of profane language and judgment guilty as to that count."

[e]ven were we to assume, *arguendo*, that the officer's original order to "move on" was ill-advised, Appellant's verbal abuse, "trigger words," profanity, and curses directed at the officer were not a permissible response.

The case in its present posture raises several issues:

First, is a conviction under Section 1107 sustainable if the statute is not interpreted to require something more than simply the utterance of profane and obscene language in public?  Second, if something more is required, was the information adequate, and did the trial judge apply the proper construction at the trial?  Only if affirmative answers to these questions are warranted need we reach the other issues of whether there was substantial evidence to support appellant's conviction, and whether appellant's actions were constitutionally privileged under the First Amendment, thus making the application of the statute to him unconstitutional.  We find that Section 1107 would require an additional element in order to be constitutional. Because the information did not allege this element, we reach the result of reversal and dismissal.  We have, in addition, no confidence that the trial court weighed the evidence in the light of the requisite construction and this too requires the conviction to fall.  Thus, we have no occasion to pass on the adequacy of the evidence or the constitutionality of the statute as it would have been applied to appellant had he been charged and tried properly by reference to it.

11. The statute prohibits not only the use of such language in a public place, but also its use "in any place wherefrom the same may be heard" in public.

12. The prosecution's new position is that "in enacting this statute Congress intended to place within its reach profane and obscene utterance [1] calculated to cause a breach of the peace" or [2] which "tends to corrupt public morals or outrage the sense of public decency." See Appellee's Reply to Supplemental Memorandum for Rehearing *en banc* 9, 10.

## IV

That portion of Section 1107 which makes it illegal for any person "to curse, swear, or make use of any profane language or indecent or obscene words" is on it face extraordinarily broad, so broad in fact that it would allow punishment of the hapless stonemason who, after crushing his toe, innocently utters a few relieving expletives within earshot of a public place.[11] Appellant has argued, before the D.C. Court of Appeals and this court, both to the division and *en banc*, that Section 1107 should be construed to apply only under circumstances where the language either threatens a breach of the peace, or is so grossly offensive to citizens actually hearing it as to amount to a nuisance.

The prosecution, contrarily, argued to the D.C. Court of Appeals and the division of this court that there was no necessity to narrow Section 1107 by adding an additional element to the offense. Before this court *en banc*, however, the Corporation Counsel now takes the position that the statute should be construed to include additional elements beyond its actual language,[12] so that words alone will not support a conviction.  With all the fervor of a recent convert, the prosecution even adduces legislative history in support of the narrowing interpretation.[13]

An examination of the relevant interests involved, as well as a recognition of the serious constitutional problems posed by a notably broad statute regulating speech,[14] leads us to be-

13. The legislative history, as one might suspect, is rather scanty, but appellee points out that what does exist is not inconsistent with the view that Congress intended to prevent behavior which disturbed the "public peace and good order" and not simply to prescribe a code of morals for private action. *See* H.R.Rep. No. 1050, 55th Cong., 2d Sess. (1898).

14. *See, e. g.,* Cox v. Louisiana, 379 U.S. 536, 552, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) (breach of peace statute held "unconstitutional in that it sweeps within its broad scope activities that are constitu-

lieve that Section 1107 could be validly applied only if it were construed to require something more than simply the utterance of profane or obscene language in a public place. The District of Columbia appears to have no legitimate interest in punishing a person simply because he has uttered, out of the presence of anyone else, some words which might be considered "obscene" or "profane." As the Supreme Court has recently indicated in Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), the state has no "right to protect the individual's mind from the effects of obscenity" simply because it wishes "to control the moral content of a person's thoughts." This, the Court said, would be inconsistent with the "philosophy of the First Amendment." [15]

To determine those interests which are relevant, it is useful to examine the Supreme Court's opinion in Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). There the Court upheld, over First Amendment objections, a conviction under a New Hampshire statute which provided in relevant part:

No person shall address any offensive, derisive or annoying word to any other person who is lawfully in any street or other public place, nor call him by any offensive or derisive name * * *.

However, the New Hampshire Supreme Court had, by an earlier decision, explicitly narrowed the statute, and declared that its purpose was to protect the public peace: No words were forbidden " 'except such as have a direct tendency to cause acts of violence by the persons to whom, individually, the remark is addressed'. * * * Such words, as ordinary men know, are likely to cause a fight." [16] By affirming the conviction, the United States Supreme Court showed that the state had a legitimate interest in punishing profane or obscene words spoken in public under circumstances which created a substantial threat of violence. Both the facts of *Chaplinsky* itself,[17] and the cases which followed it,[18] indicate that the circumstances under which words are spoken are of critical importance in deciding whether the Constitution permits punishment to be imposed.

tionally protected free speech and assembly") ; Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940) (loitering and picketing statute used to prohibit peaceful picketing held invalid on its face) ; Stromberg v. California, 283 U.S. 359, 369, 51 S.Ct. 532, 536, 75 L.Ed. 1117 (1931) (California statute prohibiting display of red flag "which upon its face, and as authoritatively construed, is so vague and indefinite as to permit the punishment of the fair use of this opportunity [for free political discussion] is repugnant to the guaranty of liberty contained in the Fourteenth Amendment").

15. 394 U.S. at 566, 89 S.Ct. 1243.

16. 315 U.S. at 573, 62 S.Ct. at 770, quoting from State v. Brown, 68 N.H. 200, 38 A.2d 731 (1894).

17. Chaplinsky's remarks were made in an atmosphere of disorder and near riot. At a busy intersection, Chaplinsky was distributing literature which denounced "all religion as a 'racket.'" There were complaints to the authorities, and one

"disturbance" occurred which obstructed traffic. In this context, to a city Marshal who had just repeated earlier warnings that "the crowd was getting restless," Chaplinsky said, "you are a God damned racketeer" and "a damned Fascist, and the whole Government of Rochester are Fascists or agents of Fascists."

18. Street v. New York, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969) ; Terminiello v. City of Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). In *Terminiello* the Court said :
"Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute [citing *Chaplinsky*] is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. * * *"
337 U.S. at 4, 69 S.Ct. at 896.

Apart from punishing profane or obscene words which are spoken in circumstances which create a threat of violence, the state may also have a legitimate interest in stopping one person from "inflict[ing] injury" [19] on others by verbally assaulting them with language which is grossly offensive because of its profane or obscene character. The fact that a person may constitutionally indulge his taste for obscenities in private does not mean that he is free to intrude them upon the attentions of others. In this regard, the Supreme Court's obscenity decisions are instructive. Although the First and Fourteenth Amendments prohibit criminal punishment of private possession of obscene materials,[20] this does not mean a state cannot punish one who commercially exploits similar literature through public advertisements which are sexually provocative.[21]

We therefore conclude that Section 1107 would not be invalid if the statutory prohibition against profane or obscene language in public were interpreted to require an additional element that the language be spoken in circumstances which threaten a breach of the peace.[22] And for these purposes a breach of the peace is threatened either because the language creates a substantial risk of provoking violence,[23] or because it is, under "contemporary community standards," [24] so grossly offensive to members of the public [25] who actually overhear it as to amount to a nuisance.

19. Chaplinsky v. New Hampshire, 315 U.S. at 572, 62 S.Ct. 766.

20. Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

21. See Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1965).

22. Since appellant's conviction does not admit of affirmance under the statute if so narrowed, we have no occasion to decide at this time when it is appropriate for a court to save a statute by adding an additional element. Although the Supreme Court on many occasions has countenanced narrowing constructions of both federal and state criminal statutes, it has also on occasion recognized that there are limits to judicial reshaping of legislative enactments. *Compare, e. g.,* United States v. National Dairy Products Corp., 372 U.S. 29, 31–36, 83 S.Ct. 594, 9 L.Ed.2d 561 (1962), and Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S. Ct. 766, 86 L.Ed. 1031 (1942), *with* Aptheker v. Secretary of State, 378 U.S. 500, 515–516, 84 S.Ct. 1659, 12 L.Ed. 2d 992 (1964), and United States v. Robel, 389 U.S. 258, 262, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967).

23. As the American Law Institute has noted,

Insofar as the theory of disorderly conduct rests on the tendency of the actor's behavior to provoke violence in others, one must suppose that policemen, employed and trained to maintain order, would be least likely to be provoked to disorderly responses.

Model Penal Code § 250.1, Comment at p. 14 (Tent.Draft No. 13, 1961). A policeman's special powers and training, and his constant exposure to situations where the norms of common speech are not distinguished by unvarying delicacy of expression, leave him less free to react as quickly as the private citizen to a purely verbal assault. In a situation where he is both the victim of the provocative words of abuse and the public official entrusted with a discretion to initiate through arrest the criminal process, the policeman may, ordinarily at least, be under a necessity to preface arrest by a warning. It would appear that there is no First Amendment right to engage in deliberate and continued baiting of policemen by verbal excesses which have no apparent purpose other than to provoke a violent reaction.

24. *See* A Book Named "John Cleland's Memoirs of A Woman of Pleasure" v. Attorney General of Commonwealth of Massachusetts, 383 U.S. 413, 418, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966); Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).

25. In this regard, it is appropriate to consider carefully the distinctions found in the proposed Model Penal Code. The disorderly conduct provision prohibits "offensively coarse utterances" and "abusive language" which creates a *"public"* annoyance. Model Penal Code § 250.2 (Proposed Official Draft, 1962) (emphasis supplied). The word "public" was used to exclude from the offense situations where it is only "the policeman's

## V

The Corporation Counsel argues in effect that appellant's conviction can stand under this restrictive reading of the statute because (1) it was the reading which the trial judge applied in finding appellant guilty, (2) the evidence was adequate to support the verdict on this theory, and (3) appellant's behavior was not privileged under the First Amendment.

■■ There is in our view, however, a defect in appellant's conviction which is not repaired by these considerations, even if they be assumed to be true. It relates to the information itself which we, unlike the division, do not read as alleging that appellant uttered the words in question under circumstances likely to cause a breach of the peace. Upon a close reading, it appears that the information was drawn upon the premise which the prosecution relied until this rehearing *en banc*, namely, that the element of a threatened breach of the peace is not an essential one in the crime with which appellant was charged under Section 1107. The critical phrase, "under circumstances such that a breach of the peace may be occasioned," modifies the refusal to move on charge, not the profane language charge. It is hardly surprising that this should be so since that was the way the prosecutor then viewed the requirements of the two statutes. Thus, appellant was put to trial on an information omitting to charge an element which we have found would be an essential component of the crime created by Section 1107. The law is clear that an

information is defective if it fails to allege a "critical element" of the offense charged.

Rule 6(a) of the Criminal Rules of the Court of General Sessions provides:

The information shall contain a plain, concise and definite written statement of the essential facts constituting the offense charged. * * *

Because the language of this rule follows that of Federal Rule 7(c),[26] the cases interpreting the Federal Rule provide guidance for the proper interpretation of the General Sessions Rule.

■ While an indictment or information which follows the language of the statute defining the offense is ordinarily sufficient, this is not the case if an essential element of the offense is not contained in the statutory language. *Honea v. United States*, 344 F.2d 798, 803–804 (5th Cir. 1965).[27] In *Honea*, the indictment was for the crime of obtaining money by a false impersonation of a federal employee. Although the statute defining this offense did not expressly require that the impersonation be made with an intent to defraud, the court decided that such intent was an "essential element" of the offense. It then held that, although the indictment followed the statutory language, it was defective for "failing to include an allegation" that the impersonation was with an intent to defraud. The court said:

As to whether the absence of an allegation that Honea did the acts in question with intent to defraud makes this indictment insufficient, our problem is much easier. This Court has

---

peace and quiet that are allegedly disturbed." Model Penal Code § 250.1, Comment at pp. 13, 17 (Tent.Draft No. 13, 1961). On the other hand, Model Penal Code § 250.4 (Proposed Official Draft, 1962), which prohibits language which might "provoke violence," does include within its protection policemen as well as members of the public. *See generally* Model Penal Code § 250.1, Comment at pp. 13–18 (Tent.Draft No. 13, 1961).

26. Fed.R.Crim.P. 7(c) provides:
   The indictment or information shall be a plain, concise and definite written statement of the essential facts constituting the offense charged.

27. *See* Standard Oil Co. of Tex. v. United States, 307 F.2d 120 (5th Cir. 1962) (indictment which charged defendants "did fail and neglect to keep complete records" is insufficient allegation for crime in which "knowing violation" is a critical element).

recently stated in Walker v. United States, supra:

'It is elementary that an indictment must set forth the elements of the offense to be charged, and if it does not a conviction based thereon cannot stand.' 342 F.2d [22] at 26.

See also Russell v. United States, 1962, 369 U.S. 749, 763–764, 82 S.Ct. 1038, 8 L.Ed.2d 240; 4 Barron, Federal Practice and Procedure § 1913 and 1964 Supp. § 1913 (Wright ed.). 'An indictment or information in the language of the statute [as here] ordinarily is sufficient, except where the words of the statute do not contain all of the essential elements of the offense; but if the statute omits an essential element, the indictment must supply it with certainty.' Babb v. United States, 5 Cir., 218 F.2d 538, 539. One of the laudable reforms of the Federal Rules of Criminal Procedure was to eliminate the necessity for much of the cumbersome claptrap which typically encased the common law indictment. See F.R.Cr.P. 7. Yet 'the substantial safeguards to those charged with serious crimes cannot be eradicated under the guise of technical departures from the rules.' Smith v. United States, 1959, 360 U.S. 1, 9, 79 S.Ct. 991, 997, 3 L.Ed.2d 1041. It is often said that an indictment must (a) apprise the defendant of what he will have to meet and (b) protect him from double jeopardy. This indictment is sufficient as to (b), but, as in Russell, insufficient as to (a).

344 F.2d 803, 804.

■■ This court is not disabled from noticing the defect in the information because at trial appellant may not have objected to it for failing to allege an of-fense.[28] Although the Criminal Rules of the General Sessions Court do provide that most objections "based on defects * * * in the information" must be raised "by motion before trial" to avoid a waiver, there is an explicit exception for an objection that the information fails "to charge an offense." The relevant Rule in fact provides that "the failure of the information to charge an offense *shall be noticed by the court at any time* during the pendency of the proceeding."[29] Once again, the General Sessions Rule parallels that of the Federal Rules of Criminal Procedure. See FED.R. CRIM.P. 12(b) (2). And the case law under the federal rule clearly indicates that an appellate court can notice for the first time on appeal the fact that an indictment does not contain an essential element of an offense, even though that element is not revealed in the statute itself. *See* Walker v. United States, 342 F.2d 22 (5th Cir. 1965); Finn v. United States, 256 F.2d 304 (4th Cir. 1958). The information having failed to charge an offense, the conviction founded upon it cannot stand, and the information itself is subject to dismissal.

We are reinforced in this result by a lack of certainty that the trial court weighed the evidence under a correct view of the statute. Although the division did infer that the court found appellant guilty of using profane and obscene language "under circumstances such that a breach of the peace may be occasioned," the only support in the record for that conclusion is the statement, at the beginning of the trial court's "Statement of Proceedings and Evidence," that appellant was "charged with * * * use of 'profane, indecent and obscene words' under circumstances such that a breach of peace may be occasioned. * * *"[30]

28. Because we have no transcript of the actual trial proceedings, the exact scope of the motions made is not clear. The record indicates that appellant did object to the information, apparently on the ground that it alleged two charges in one count.

29. Gen.Sess.Crim.R. 10(b) (emphasis added).

30. The opening paragraph reads:
This defendant appeared before the Court on December 29, 1965 charged with two counts of disorderly conduct; namely (1) use of "profane, indecent

That this is *not* what appellant was charged with is clear from the face of the information. *See* p. 647, *supra*.

While it is thus clear that the trial court misread the information when the account of the trial was written up some four and a half months after it took place, there is nothing in the record which shows that it properly weighed the evidence in light of the interpretation of the statute which we have found to be a necessary predicate of constitutionality. There are, good reasons to suppose that the court in fact failed to make any findings related to breach of the peace. First, the statute by its terms did not require such a finding, and the D.C. Court of Appeals had never read any such requirement into the statute. Second, there is every reason to suppose that the prosecution's position at the trial, as it was until this case was accepted for *en banc* reconsideration, was that there was no need to prove that the profanity threatened a breach of the peace in order to violate Section 1107. Third, the trial court made no findings of fact that a breach of peace was threatened, and the judgment entered by the trial court, written on the day of trial and not four and a half months later, simply found appellant guilty of the "use of profane language." [31] And, finally, it is not without significance that the D.C. Court of Appeals in its opinion nowhere views the General Sessions Court as having found a threat of a breach of the peace. Where, as here, there is so much uncertainty that a trial court applied the correct view of a criminal statute to the facts before it, the conviction must fall. *See* Shuttlesworth v. City of Birmingham, 382 U.S. 87, 92, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965).

We have, therefore, no occasion to pursue the matter of whether, had the information been sufficient and had the trial judge applied the proper standard, the evidence would have supported the conviction. That, we remark in passing, is not an inquiry most fairly and effectively to be made by reference to an abbreviated recollection of what witnesses said nearly five months before. Neither do we think it useful to speculate in these circumstances upon the constitutionality of Section 1107 as it might have been applied to appellant on this record, or to others in facts not before us at all. We are of the opinion that the construction seemingly placed upon Section 1107 by the D.C. Court of Appeals is an untenable one, and one which, had it been persisted in by the prosecution, would have made that statute vulnerable to constitutional attack on its face.

We reverse the judgment of the D.C. Court of Appeals and remand the case to the Court of General Sessions with directions that the judgment of conviction be vacated and the information dismissed.

It is so ordered.

DANAHER, Circuit Judge (dissenting):

Notoriously, as the records in many cases coming here have disclosed, the 2700 block of 14th Street, N.W. is a prime trouble spot. As shown in the "Statement of Proceedings and Evidence" filed by the trial judge, the events occurred about 7:30 on a Saturday evening when the area was generally congested and sidewalks were crowded. Even slight incidents can and often do flare into disorder and riots, especially where the police assert some measure of authority in their effort to maintain a degree of public peace. Granted that some officers may be overzealous on occasion, a citizen is not without various remedies, indeed in this very case, a complaint to the police department was lodged against Officer Freto.

Perhaps the group including the appellant had not been obstructing pedes-

and obscene words" under circumstances such that a breach of peace may be occasioned, and (2) congregating with others on a public street and refusing to move on when ordered to do so by the police. Defendant entered a plea of not guilty to both counts and the following testimony was then given. * * *

31. *See* note 10, *supra*.

trian use of the sidewalk. Possibly the officer therefore should not have directed that they move. Yet instead of seeking peaceful redress because of such commands, the appellant openly flouted the officer. His truculence was made apparent in unmistakable terms when he told the officer "no son of a bitch" was going to make him move. Such an expression and others disclosing the appellant's attitude, undoubtedly figured in efforts by his erstwhile companions and even his wife to persuade him that his position, if inflexible, was rash at the very least.[1]

Presumably untutored in the niceties of the law as some of my colleagues would read it, those who were right there at the scene realized that the appellant's conduct might occasion a breach of the peace.

So in retrospect it seemed to the prosecutor who charged that the appellant had used certain language "under circumstances such that a breach of the peace may be occasioned thereby." So it seemed to the trial judge who after finding the appellant guilty, had prepared for use on appeal his "Statement of Proceedings and Evidence."[2] So it seemed to a majority of the sitting division who first heard argument on the issue.[3]

I think the conviction should stand[4] for the appellant's "fighting words" were not a "permissible response" as the Supreme Court put it in Chaplinsky v. New Hampshire, 315 U.S. 568, 573, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). This is especially true, in my assessment as our sitting division's opinion had it, because the information and the trial judge's "Statement" described the appellant's words as uttered "under circumstances such that a breach of peace may be occasioned." That was the basis for the conviction, quite correctly entered I submit.[5]

I am authorized to state that Senior Circuit Judge WILBUR K. MILLER and Circuit Judge TAMM concur in this dissent.

BURGER, Circuit Judge, (dissenting):

I concur fully with Judge Danaher because I adhere to the views expressed in my original opinion for a division of the court in this case. I desire to emphasize only one additional point. Judge McGowan's present opinion for a majority of the court sitting *en banc* has focused upon what is now characterized as a defective information when the information is measured by the "newly construed" statutory provision. This is done, notwithstanding that the Appellant made no challenge to the information at trial and the trial court expressed its understanding that Appellant was "charged with * * * use of 'profane, indecent and obscene words' *under circumstances*

---

1. And the defense at trial attempted to refute and clearly understood the nature of and the basis for the charge upon which conviction was entered.

2. I fail to understand the reason for the implication, twice repeated, that the trial judge's "Statement" is here subject to impeachment or rejection because "written up some four and a half months" after the trial. The judge may have had far more copious notes than we take, indeed some trial judges even utilize shorthand.

3. With the contention of the appellant himself so read and so related to the saving breach of the peace element, I am not concerned that counsel for the District urged varying grounds to predicate affirmance.

4. The statement by the District of Columbia Court of Appeals of an incorrect reason for the right result does not invalidate its judgment.

5. Contrast the record here with that in Cantwell v. Connecticut, 310 U.S. 296, 310, 60 S.Ct. 900, 906, 84 L.Ed. 1213 (1940) where Mr. Justice Roberts found there had been no "threatening of bodily harm, no truculent bearing, no intentional discourtesy, no personal abuse," and on that account, he there discerned no present menace to public peace and order. I thus range myself with the analysis of such cases as *Cantwell* and *Chaplinsky* as submitted by Mr. Justice Jackson, dissenting, in Terminiello v. Chicago, 337 U.S. 1 at 26 and 27, 69 S.Ct. 894, 93 L. Ed. 1131 (1949).

*such that a breach of the peace may be occasioned * * * ".*[1]

The trial court conducted these proceedings and I see no basis whatever to substitute this court's three-and-one-half-year removed "uncertainty that a trial court applied the correct view of a criminal statute to the facts before it." I am particularly loath to do so when the resultant disposition serves no reasonable purpose.

WILBUR K. MILLER, J., concurs in this dissent.

---

1. Indeed, before the original division of this court no point was made of the grounds now relied upon by the majority.