STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
SALVATORE PROFACI, JR., DEFENDANT-APPELLANT.

Argued May 5, 1970—Decided June 26, 1970.

*Mr. Frank J. Palma* argued the cause for appellant (*Messrs. Santo and Palma,* attorneys; *Mr. Julius Zizmor* on the brief).

*Mr. William D. Danberry,* Assistant County Prosecutor, argued the cause for the respondent (*Mr. Edward J. Dolan,* Middlesex County Prosecutor, attorney).

The opinion of the court was delivered by

HANEMAN, J. This case involves the constitutionality of *N. J. S. A.* 2A:170–29(1), a section of the Disorderly Persons Act.

Defendant was convicted in the Municipal Court of the Township of Monroe of violating the above statute which reads:

1. Any person who utters loud and offensive or profane or indecent language in any public street or other public place, public conveyance, or place to which the public is invited; * * *.

\*     \*     \*     \*     \*     \*     \*     \*

Is a disorderly person.

Defendant appealed to the Middlesex County Court which after a trial *de novo* on the Municipal Court record, again found him guilty. Defendant appealed to the Appellate Division which affirmed in an unreported *per curiam* opinion. Defendant appealed to this Court upon the ground of the existence of a substantial constitutional question. *R.* 2:2–1.

The facts as elicited at the trial are as follows: State Trooper Martens testified that on July 13, 1968, at approximately 7:00 P.M., he stopped defendant's vehicle on Bentley Road, Monroe Township, for a routine motor vehicle check. Upon discovering that his driver's license was unsigned, Martens informed defendant that he was going to issue a warning. Defendant allegedly excited from his car and while still on the road, in a loud voice, stated, "what the f—— are you bothering me for." Martens advised defend-

ant that he was under arrest for using loud and profane language.

Martens further testified that Trooper Cavaliere who had arrived on the scene minutes after defendant's car was stopped, overheard defendant utter the objectionable language. On cross-examination it developed that there was only one house on Bentley Road and that the house was set back about 300 feet from the scene of the incident. Martens stated that besides himself and Cavaliere, no one was present when the words were uttered. Trooper Cavaliere corroborated Martens' testimony that defendant made the statement containing the objectionable language.

Defendant testified that he had not made the statement attributed to him by the State Troopers and recited a contradictory factual statement of events.

The main thrust of defendant's argument is that *N. J. S. A.* 2A:170–29(1) is so vague and indefinite that it violates the First Amendment and the Due Process Clause of the Fourteenth Amendment of the United States Constitution. Defendant argues that the statute neither defines the words "loud or offensive or profane or indecent" nor states under what circumstances the language is proscribed.

Some basic guides for ascertaining the constitutionality of statutes bear repeating. It must be remembered that the presumption is that the legislature acted with existing constitutional law in mind and intended the act to function in a constitutional manner. The articulation of the elements which furnish that essential intent need not appear in the statutory language. *Lomarch Corp. v. Mayor of Englewood,* 51 *N. J.* 108 (1968). The further presumption is that a statute will not be declared inoperative and unenforceable unless it is plainly in contravention of a constitutional mandate or prohibition. *Daly v. Daly,* 21 *N. J.* 599 (1956). See also *Russo v. Governor of State of New Jersey,* 22 *N. J.* 156, 170 (1956); *In re Loch Arbour,* 25 *N. J.* 258, 262 (1957); *State v. Hudson County News Co.,* 35 *N. J.* 284, 294 (1961); *State v. Monteleone,* 36 *N. J.* 93,

99 (1961). Even though a statute may be open to a, construction which would render it unconstitutional or permit its unconstitutional application, it is the duty of this Court to so construe the statute as to render it constitutional if it is reasonably susceptible to such interpretation. *Woodhouse v. Woodhouse,* 17 *N. J.* 409 (1955).

We come to a consideration of the statute *sub judice.* The applicable principles for the ascertainment of whether this statute is unconstitutional because of vagueness, indefiniteness or overbreadth are so aptly and adequately stated in *Landry v. Daley,* 280 *F. Supp.* 938 (*N. D. Ill.* 1968) appeal dismissed 393 *U. S.* 220, 89 *S. Ct.* 455, 21 *L. Ed. 2d* 392 (1968), docketed for reargument *sub nom. Boyle v. Landry,* 395 *U. S.* 955, 89 *S. Ct.* 2095, 23 *L. Ed. 2d* 744 (1969), as not to require paraphrasing. The court said:

The concept of vagueness or indefiniteness rests on the constitutional principle that procedural due process requires fair notice and proper standards for adjudication. The primary issues involved are whether the provisions of a penal statute are sufficiently definite to give reasonable notice of the prohibited conduct to those who wish to avoid its penalties and to appraise judge and jury of standards for the determination of guilt. If the statute is so obscure that men of common intelligence must necessarily guess at its meaning and differ as to its applicability, it is unconstitutional.

The concept of overbreadth, on the other hand, rests on principles of substantive due process which forbid the prohibition of certain individual freedoms. The primary issue is not reasonable notice or adequate standards, although these issues may be involved. Rather the issue is whether the language of the statute, given its normal meaning, is so broad that its sanctions may apply to conduct protected by the Constitution. Frequently, the resolution of this issue depends upon whether the statute permits police and other officials to wield unlimited discretionary powers in its enforcement. If the scope of the power permitted these officials is so broad that the exercise of constitutionally protected conduct depends on their own subjective views as to the propriety of the conduct, the statute is unconstitutional.

These concepts have particular relevance to statutes touching upon the areas of free speech and assembly. Although the state may regulate speech and assembly where the exercise of these rights conflicts with certain state interests, it may regulate only to the extent necessary to discharge these interests. A vague or overbroad statute, however, is likely to have a deterrent effect which is beyond that neces-

sary to fulfill the state's interests. Rather than chance prosecution, people will tend to refrain from speech and assembly which might come within the statute's ambit.

Such a deterrent effect on the exercise of these rights is impermissible under the First Amendment. The Amendment was designed not only to protect these rights, but also to encourage their use. Consequently, the requirements of clarity, definiteness, and narrow scope are most strictly observed when a statute places a possible limitation upon First Amendment rights. Such scrutiny is necessary to provide a buffer between the valid exercise of the police power by the state and excessive restriction of the free dissemination of ideas.

A number of factors are taken into consideration in determining whether a state regulation meets these standards of clarity and narrowness. Among them are: (1) whether a substantial interest worthy of protection is indentified or apparent from the language of the statute; (2) whether the terms of the regulation are susceptible to objective measurement by men of common intelligence; (3) whether those charged with its enforcement are vested only with limited discretion; (4) if penal, whether some element of knowledge or intent to obstruct a state interest is required; and (5) whether its clarity is dependent upon manifold cross-reference to inter-related enactments or regulations." 280 *F. Supp.* at 951–953 (footnotes omitted).

In *Chaplinsky v. New Hampshire,* 315 *U. S.* 568, 62 *S. Ct.* 766, 86 *L. Ed.* 1031 (1942), the court had under consideration a statute of the State of New Hampshire similar to that now under consideration which read:

"No person shall address any offensive, derisive or annoying word to any other person who is lawfully in any street or other public place, nor call him by any offensive or derisive name, nor make any noise or exclamation in his presence and hearing with intent to deride, offend or annoy him, or to prevent him from pursuing his lawful business or occupation."

In assaying the constitutionality of the act, the court said at 315 *U. S.* 571–572, 62 *S. Ct.* 769, 86 *L. Ed.* 1035:

Allowing the broadest scope to the language and purpose of the Fourteenth Amendment, it is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and ob-

scene, the profane, the libelous, and the insulting or "fighting" words —those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. "Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument." Cantwell v. Connecticut, 310 U. S. 296, 309, 310, 60 S. Ct. 900, 906, 84 L. Ed. 1213, [1221], 128 A. L. R. 1352.

And again at 315 *U. S.* 573–574, 62 *S. Ct.* 770, 86 *L. Ed.* 1036:

On the authority of its earlier decisions, the state court declared that the statute's purpose was to preserve the public peace, no words being "forbidden except such as have a direct tendency to cause acts of violence by the persons to whom, individually, the remark is addressed." It was further said: "The word 'offensive' is not to be defined in terms of what a particular addressee thinks. * * * The test is what men of common intelligence would understand would be words likely to cause an average addressee to fight. * * * The English language has a number of words and expressions which by general consent are 'fighting words' when said without a disarming smile. * * * Such words, as ordinary men know, are likely to cause a fight. So are threatening, profane or obscene revilings. Derisive and annoying words can be taken as coming within the purview of the statute as heretofore interpreted only when they have this characteristic of plainly tending to excite the addressee to a breach of the peace. * * * The statute, as construed, does no more than prohibit the face-to-face words plainly likely to cause a breach of the peace by the addressee, words whose speaking constitute a breach of the peace by the speaker —including 'classical fighting words', words in current use less 'classical' but equally likely to cause violence, and other disorderly words, including profanity, obscenity and threats."

We are unable to say that the limited scope of the statute as thus construed contravenes the Constitutional right of free expression. It is a statute narrowly drawn and limited to define and punish specific conduct lying within the domain of state power, the use in a public place of words likely to cause a breach of the peace. Cf. Cantwell v. Connecticut, 310 U. S. 296, 311, 60 S. Ct. 900, 906, 84 L. Ed. 1213, [1221], 128 A. L. R. 1352; Thornhill v. Alabama, 310 U. S. 88, 105, 60 S. Ct. 736, 745, 84 L Ed. 1093, [1104]. This conclusion necessarily disposes of appellant's contention that the statute is so vague and indefinite as to render a conviction thereunder a violation of due process. A statute punishing verbal acts, carefully drawn so as not

unduly to impair liberty of expression, is not too vague for a criminal law. Cf. Fox v. Washington, 236 U. S. 273, 277, 35 S. Ct. 383, 384, 59 L. Ed. 573, 575.

Nor can we say that the application of the statute to the facts disclosed by the record substantially or unreasonably impinges upon the privilege of free speech. Argument is unnecessary to demonstrate that the appellations "damn racketeer" and "damn Fascist" are epithets likely to provoke the average person to retaliation, and thereby cause a breach of the peace.

See also *Street v. New York*, 394 U. S. 576, 89 S. Ct. 1354, 22 L. Ed. 2d 572, (1969).

So here, although not expressly articulated, the implicit constitutional purpose of *N. J. S. A.* 2A:170-29(1) is two-fold, *i. e.*, to preserve the peace and to protect the sensibilities of those persons within hearing of the person uttering the language. For a defendant to be guilty under *N. J. S. A.* 2A:170-29(1) the words must be spoken loudly, in a public place and must be of such a nature as to be likely to incite the hearer to an immediate breach of the peace or to be likely, in the light of the gender and age of the listener and the setting of the utterance, to affect the sensibilities of a hearer. The words must be spoken with the intent to have the above effect or with a reckless disregard of the probability of the above consequences. Accordingly, the statute is constitutional.

Here, however, an anlysis of the facts fails to disclose that the language used under the circumstances was likely to incite a breach of the peace or to offend the sensibilities of the listener. Accordingly we find the conviction in error.

Reversed.

*For reversal*—Chief Justice WEINTRAUB and Justices FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—6.

*For affirmance*—None.