No. 71–1044. ROSENFELD *v.* NEW JERSEY. Appeal from Super. Ct. N. J. Judgment vacated and case remanded for reconsideration in light of *Cohen* v. *Cali-*

*fornia,* 403 U. S. 15 (1971), and *Gooding* v. *Wilson,* 405 U. S. 518 (1972). 

Mr. Chief Justice Burger, with whom Mr. Justice Blackmun and Mr. Justice Rehnquist join, dissenting.*

I am constrained to express my profound disagreement with what the Court does in these three cases on the basis of *Gooding* v. *Wilson,* 405 U. S. 518 (1972).

The important underlying aspect of these cases goes really to the function of law in preserving ordered liberty. Civilized people refrain from "taking the law into their own hands" because of a belief that the government, as their agent, will take care of the problem in an organized, orderly way with as nearly a uniform response as human skills can manage. History is replete with evidence of what happens when the law cannot or does not provide a collective response for conduct so widely regarded as impermissible and intolerable.

It is barely a century since men in parts of this country carried guns constantly because the law did not afford protection. In that setting, the words used in these cases, if directed toward such an armed civilian, could well have led to death or serious bodily injury. When we undermine the general belief that the law will give protection against fighting words and profane and abusive language such as the utterances involved in these cases, we take steps to return to the law of the jungle. These three cases, like *Gooding,* are small but symptomatic steps. If continued, this permissiveness will tend further to erode public confidence in the law—that subtle but indispensable ingredient of ordered liberty.

---

*[This opinion applies also to No. 70–5323, *Lewis* v. *City of New Orleans, post,* p. 913, and No. 71–6535, *Brown* v. *Oklahoma, post,* p. 914.]

In Rosenfeld's case, for example, civilized people attending such a meeting with wives and children would not likely have an instantaneous, violent response, but it does not unduly tax the imagination to think that some justifiably outraged parent whose family were exposed to the foul mouthings of the speaker would "meet him outside" and, either alone or with others, resort to the 19th century's vigorous modes of dealing with such people. I cannot see these holdings as an "advance" in human liberty but rather a retrogression to what men have struggled to escape for a long time.

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE and MR. JUSTICE BLACKMUN join, dissenting.

It has long been established that the First and Fourteenth Amendments prohibit the States from punishing all but the most "narrowly limited classes of speech." *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 571 (1942). The right of free speech, however, has never been held to be absolute at all times and under all circumstances. To so hold would sanction invasion of cherished personal rights and would deny the States the power to deal with threats to public order. As the Court noted in *Chaplinsky:*

> "[I]t is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are

of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. 'Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.' *Cantwell* v. *Connecticut,* 310 U. S. 296, 309–310." 315 U. S., at 571–572. (Footnotes omitted.)

This case presents an example of gross abuse of the respected privilege in this country of allowing every citizen to speak his mind. Appellant addressed a public school board meeting attended by about 150 people, approximately 40 of whom were children and 25 of whom were women. In the course of his remarks he used the adjective "m----- f------" on four occasions, to describe the teachers, the school board, the town, and his own country.

For using this language under these circumstances, appellant was prosecuted and convicted under a New Jersey statute which provides:

"Any person who utters loud and offensive or profane or indecent language in any public street or other public place, public conveyance, or place to which the public is invited . . . [i]s a disorderly person." N. J. Rev. Stat. § 2A:170–29 (1) (1971).

Prior to appellant's prosecution, the Supreme Court of New Jersey had limited the statute's coverage as follows:

"[T]he words must be spoken loudly, in a public place and must be of such a nature as to be likely to incite the hearer to an immediate breach of the peace or to be likely, in the light of the gender and age of the listener and the setting of the utterance, to affect the sensibilities of a hearer. The words

must be spoken with the intent to have the above effect or with a reckless disregard of the probability of the above consequences." *State* v. *Profaci,* 56 N. J. 346, 353, 266 A. 2d 579, 583–584 (1970).

The Court today decides to vacate and remand this case for reconsideration in light of *Gooding* v. *Wilson,* 405 U. S. 518 (1972), and *Cohen* v. *California,* 403 U. S. 15 (1971). As it seems to me that neither of these cases is directly relevant, and that considerations not present in those cases are here controlling, I respectfully dissent.

Perhaps appellant's language did not constitute "fighting words" within the meaning of *Chaplinsky.* While most of those attending the school board meeting were undoubtedly outraged and offended, the good taste and restraint of such an audience may have made it unlikely that physical violence would result. Moreover, the offensive words were not directed at a specific individual. But the exception to First Amendment protection recognized in *Chaplinsky* is not limited to words whose mere utterance entails a high probability of an outbreak of physical violence. It also extends to the willful use of scurrilous language calculated to offend the sensibilities of an unwilling audience.

The Court of Appeals for the District of Columbia Circuit has addressed this issue more explicitly. Judge McGowan, writing for the court *en banc* in *Williams* v. *District of Columbia,* 136 U. S. App. D. C. 56, 419 F. 2d 638 (1969), correctly stated:

"Apart from punishing profane or obscene words which are spoken in circumstances which create a threat of violence, the state may also have a legitimate interest in stopping one person from 'inflict[ing] injury' [*Chaplinsky* v. *New Hampshire,* 315 U. S., at 572] on others by verbally assaulting them with language which is grossly offensive because of its profane or obscene character. The fact

that a person may constitutionally indulge his taste for obscenities in private does not mean that he is free to intrude them upon the attentions of others." *Id.*, at 64, 419 F. 2d, at 646.

I agree with this view that a verbal assault on an unwilling audience may be so grossly offensive and emotionally disturbing as to be the proper subject of criminal proscription, whether under a statute denominating it disorderly conduct, or, more accurately, a public nuisance. Judge McGowan further noted in *Williams:*

> "[A] breach of the peace is threatened either because the language creates a substantial risk of provoking violence, or because it is, under 'contemporary community standards,' so grossly offensive to members of the public who actually overhear it as to amount to a nuisance." *Ibid.* (Footnotes omitted.)

The Model Penal Code, proposed by the American Law Institute, also recognizes a distinction between utterances which may threaten physical violence and those which may amount to a public nuisance, recognizing that neither category falls within the protection of the First Amendment. See Model Penal Code §§ 250.2 (1)(a) and (b). (Proposed Official Draft 1962.)

The decision in *Gooding* v. *Wilson, supra,* turned largely on an application of the First Amendment overbreadth doctrine,[1] and the Court's remand order sug-

---

[1] Insofar as the Court's decision in *Gooding* turns on vagueness principles, it seems inapplicable to this case. The essence of the due process vagueness concern is that no man shall be punished for violating a statute which is not "sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties . . . ." *Connally* v. *General Construction Co.*, 269 U. S. 385, 391 (1926). Although the New Jersey statute

gests that the overbreadth doctrine should be applied in this case. The consequences and the unusual character of the overbreadth doctrine have been accurately summarized in Note, The First Amendment Overbreadth Doctrine, 83 Harv. L. Rev. 844, 852 (1970):

> "[The overbreadth doctrine] results often in the wholesale invalidation of the legislature's handiwork, creating a judicial-legislative confrontation.
> "In the end, this departure from the normal method of judging the constitutionality of statutes must find justification in the favored status of rights to expression and association in the constitutional scheme." (Footnotes omitted.)

Because a "judicial-legislative confrontation" often results from application of the overbreadth doctrine, and because it is a departure from the normal method of judicial review,[2] it should be applied with restraint. In my view, the doctrine is not applicable in this case.

The New Jersey statute was designed to prohibit the public use of language such as that involved in this case, and certainly the State has an interest—perhaps a compelling one—in protecting nonassenting citizens from vulgar and offensive verbal assaults. A statute directed narrowly to this interest does not impinge upon the values of protected free speech. Legitimate First Amendment interests are not furthered by stretching the overbreadth doctrine to cover a case of this kind. In *Cohen* v. *California*, 403 U. S. 15 (1971), which deals

---

involved in this case is hardly a model of clarity, it cannot reasonably be said that appellant could have been unaware that the language used under the circumstances was proscribed by the statute. Unless he was a person of infirm mentality, appellant certainly knew that his deliberate use four times of what Mr. Justice Harlan termed in *Cohen* a "scurrilous epithet," in the presence of a captive audience including women and children, violated the statute.

[2] See, *e. g.*, *United States* v. *Raines*, 362 U. S. 17, 20–22 (1960)

with the question of what expressive activity is constitutionally punishable, Mr. Justice Harlan described the purpose of the free speech guarantee as follows:

> "It is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests. See *Whitney* v. *California,* 274 U. S. 357, 375–377 (1927) (Brandeis, J., concurring)." *Id.,* at 24.

The purpose of the overbreadth doctrine is to excise statutes which have a deterrent effect on the exercise of protected speech.[3] It is difficult to believe that sustaining appellant's conviction under this statute will deter others from the exercise of legitimate First Amendment rights.[4]

The line between such rights and the type of conduct proscribed by the New Jersey statute is difficult to draw.

---

[3] See Note, The First Amendment Overbreadth Doctrine, 83 Harv. L. Rev. 844, 853 (1970).

[4] Nor does the continued existence of the New Jersey statute, which must now be construed and applied by the New Jersey courts in light of *Gooding,* have the effect of deterring others in the exercise of their First Amendment rights. To remand this case with the suggestion that the overbreadth doctrine be applied accomplishes only one result: it creates the potential that appellant will receive an undeserved windfall.

I recognize, of course, that serious definitional and enforcement problems are likely to arise even where the statutes in this area are carefully drawn. Yet the inherent difficulty of the problem is not sufficient reason for legislatures and the courts to abdicate their responsibility to protect nonassenting citizens from verbal conduct which is so grossly offensive as to amount to a nuisance.

The preservation of the right to free and robust speech is accorded high priority in our society and under the Constitution. Yet, there are other significant values. One of the hallmarks of a civilized society is the level and quality of discourse. We have witnessed in recent years a disquieting deterioration in standards of taste and civility in speech. For the increasing number of persons who derive satisfaction from vocabularies dependent upon filth and obscenities, there are abundant opportunities to gratify their debased tastes. But our free society must be flexible enough to tolerate even such a debasement provided it occurs without subjecting unwilling audiences to the type of verbal nuisance committed in this case. The shock and sense of affront, and sometimes the injury to mind and spirit, can be as great from words as from some physical attacks.

I conclude in this case that appellant's utterances fall within the proscription of the New Jersey statute, and are not protected by the First Amendment. Accordingly, I would dismiss the appeal for want of a substantial federal question.

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE and MR. JUSTICE BLACKMUN join, dissenting.[*]

In *Lewis*, the police were engaged in making an arrest of appellant's son on grounds not challenged here. While the police were engaged in the performance of their duty, appellant intervened and ultimately addressed the police officers as "g-- d-- m----- f----- police." At that point she herself was arrested for violation of a city ordinance providing:

> "It shall be unlawful and a breach of the peace for any person wantonly to curse or revile or to

---

[*][This opinion applies also to No. 70–5323, *Lewis* v. *City of New Orleans, post,* p. 913, and No. 71–6535, *Brown* v. *Oklahoma, post,* p. 914.]

use obscene or opprobrious language toward or with reference to any member of the city police while in the actual performance of his duty." § 49–7, Code of City of New Orleans.

In *Rosenfeld,* appellant appeared and spoke at a public school board meeting that was held in an auditorium and was attended by more than 150 men, women, and children of mixed ethnic and racial backgrounds. It was estimated that there were approximately 40 children and 25 women present at the meeting. During his speech, appellant used the adjective "m----- f-----" on four different occasions while concluding his remarks. Testimony varied as to what particular nouns were joined with this adjective, but they were said to include teachers, the community, the school system, the school board, the country, the county, and the town.

Rosenfeld was convicted under a New Jersey statute that provides:

"Any person who utters loud and offensive or profane or indecent language in any public street or other public place, public conveyance, or place to which the public is invited . . . [i]s a disorderly person." N. J. Rev. Stat. § 2A:170–29 (1) (1971).

The New Jersey Supreme Court, prior to the instant case, had placed the following limiting construction on the New Jersey statute:

"[T]he words must be spoken loudly, in a public place and must be of such a nature as to be likely to incite the hearer to an immediate breach of the peace or to be likely, in the light of the gender and age of the listener and the setting of the utterance, to affect the sensibilities of a hearer. The words must be spoken with the intent to have the above effect or with a reckless disregard of the probability of the above consequences." *State* v.

*Profaci,* 56 N. J. 346, 353, 266 A. 2d 579, 583–584 (1970).

Appellant .in *Brown* spoke to a large group of men and women gathered in the University of Tulsa chapel. During a question and answer period he referred to some policemen as "m----- f----- fascist pig cops" and to a particular Tulsa police officer as that "black m----- f----- pig . . . ." Brown was convicted of violating an Oklahoma statute that prohibited the utterance of "any obscene or lascivious language or word in any public place, or in the presence of females . . . ." Okla. Stat. Ann., Tit. 21, § 906 (1958).

The Court vacates and remands these cases for reconsideration in the light of *Gooding* v. *Wilson,* 405 U. S. 518 (1972), and *Cohen* v. *California,* 403 U. S. 15 (1971) (the latter decided some four months before the opinion of the New Jersey Superior Court, Appellate Division, which upheld Rosenfeld's conviction, and six months before that of the Oklahoma Court of Criminal Appeals in *Brown*).

Insofar as the Court's remand is based on *Cohen, supra,* for the reasons stated in MR. JUSTICE BLACKMUN's dissenting opinion in that case, *id.,* at 27, I would not deny to these States the power to punish language of the sort used here by appropriate legislation. Appellant Lewis' words to the police officers were "fighting words," and those of appellants Rosenfeld and Brown were "lewd and obscene" and "profane" as those terms are used in *Chaplinsky* v. *New Hampshire,* 315 U. S. 568 (1942), the leading case in the field. Delineating the type of language that the States may constitutionally punish, the Court there said:

"There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise

any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. 'Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.' *Cantwell* v. *Connecticut,* 310 U. S. 296, 309–310." 315 U. S., at 571–572.

The language used by these appellants therefore clearly falls within the class of punishable utterances described in *Chaplinsky.*

*Gooding* v. *Wilson, supra,* dealt both with the type of speech that the States could constitutionally punish, and the doctrine of First Amendment overbreadth. With respect to the latter, the Court said:

"The constitutional guarantees of freedom of speech forbid the States to punish the use of words or language not within 'narrowly limited classes of speech.' *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 571 (1942). Even as to such a class, however, because 'the line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished is finely drawn,' *Speiser* v. *Randall,* 357 U. S. 513, 525 (1958), '[i]n every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom,' *Cant-*

*well* v. *Connecticut,* 310 U. S. 296, 304 (1940). In other words, the statute must be carefully drawn or be authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression." *Id.,* at 521–522.

Unless we are to distort the doctrine of overbreadth into a verbal game of logic-chopping and sentence-parsing reminiscent of common-law pleading, it cannot fairly be said here that either the New Orleans ordinance, or the New Jersey statute as construed by the highest court of that State, could reasonably be thought "unduly to infringe the protected freedom," *Cantwell* v. *Connecticut,* 310 U. S., at 304.

I would dismiss these appeals for lack of a substantial federal question.