475 P.2d 943

STATE of Arizona, Plaintiff,

v.

Morris STARSKY, Defendant.

No. 2091.

Supreme Court of Arizona,
In Banc.

Oct. 22, 1970.

Moise E. Berger, County Atty. by William Carter, Phoenix, for plaintiff.

Dushoff, Sacks & Corcoran by Jay Dushoff, LeRoy L. Miller, Phoenix, for defendant.

McFARLAND, Justice.

On May 27, 1968, Morris Starsky, hereinafter referred to as defendant, was charged in Justice Court, Tempe Precinct, County of Maricopa with violation of A.R. S. § 13-371, Arizona's disorderly conduct statute. Following his conviction in Justice Court defendant appealed to Maricopa County Superior Court under A.R.S. § 22-371. Defendant moved in Superior Court to dismiss the complaint upon the grounds that A.R.S. § 13-371 is unconstitutional. The court granted the motion to dismiss with leave on the part of the state to refile.

The County Attorney then filed an Amended Criminal Complaint which is the subject of these proceedings. The Amended Complaint charges that defendant, on the 9th day of April, 1968, in Tempe Precinct, County of Maricopa, State of Arizona, did "maliciously disturb the peace or quiet of a neighborhood, family, or person by tumultuous or offensive conduct or by applying violent, abusive or obscene epithets to another, all in violation of A.R.S. § 13-371."

The defendant moved to quash the complaint on the grounds that it did not charge the defendant with a commission of an offense in that the statute upon which the complaint is predicated, A.R.S. § 13-371, subsections A, par. 2 and A, par. 4, is unconstitutionally void for vagueness and that the statute is an unconstitutional limitation on the defendant's freedom of speech.

Upon the agreement of the defendant and the State, the following question has been certified to this Court pursuant to Rule 346, Arizona Rules of Criminal Procedure, 17 A.R.S.:

"Does the Amended Complaint charge the defendant with an offense?"

Rule 346, Rules of Criminal Procedure reads as follows:

"Rule 346. *When case to be certified*

If upon a motion to quash an indictment or information or any count thereof, or if after verdict or finding of guilty but before sentence, any question of law arises which in the opinion of the trial court is so important and doubtful as to require the decision of the Supreme court, the trial court may, if the defendant consents, certify the case to the Supreme court so far as necessary to present the question of law arising therein, and thereupon all proceedings in the action shall be stayed to await the decision of the supreme court."

The question certified to this court deals solely with the validity of A.R.S. § 13-371; no facts concerning the events were submitted.

A.R.S. § 13-371 reads as follows:

"§ 13-371. *Disturbing the peace; methods; punishment*

A. A person is guilty of a misdemeanor who maliciously and wilfully disturbs the peace or quiet of a neighborhood, family or person by:

1. Loud or unusual noise.

2. Tumultuous or offensive conduct.

3. Threatening, traducing, quarreling, challenging to fight or fighting.

4. Applying any violent, abusive or obscene epithets to another.

B. A person who violates this section shall be punished by a fine not exceeding two hundred dollars, or by imprisonment in the county jail for not to exceed two months."

Defendant first contends that A.R. S. § 13-371 is unconstitutionally void for vagueness stating that it does not give the defendant fair warning of the proscribed conduct. In State v. Locks, 97 Ariz. 148, 397 P.2d 949, this court held:

"The law must be definite and certain so that the same standard of conduct may be applied by all persons affected. The dividing line between what is lawful and

unlawful cannot be left to conjecture. The citizen cannot be held to answer charges based upon penal statutes, the mandates of which are so uncertain that they will admit to different constructions. The crime and the elements constituting it must be so clearly expressed that the ordinary person can intelligently choose in advance what course it is lawful for him to pursue. Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322; State v. Tsutomu Ikeda et al, 61 Ariz. 41, 143 P.2d 880; State v. Menderson, 57 Ariz. 103, 111 P.2d 622; State v. Jay J. Garfield Bldg. Co., 39 Ariz. 45, 3 P.2d 983."

It is a doctrine well recognized by this court that for a criminal statute to be unconstitutional for vagueness it must be so vague as to fail to give a citizen notice of what conduct on his part will lead to its violation.

■ But the standards of definiteness and certainty cannot be so extended as to impose an impossible burden on the drafters of legislation.

"* * * The Constitution has erected procedural safeguards to protect against conviction for crime except for violation of laws which have clearly defined conduct thereafter to be punished; but the Constitution does not require impossible standards. The language here challenged conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. The Constitution requires no more." United States v. Petrillo, 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877, 1883.

The statute here clearly apprises a person that certain conduct, when done maliciously and wilfully, is punishable and it does so in words easily understood and definable. It has been the law of this State, in substantially the same form, for sixty-nine years. (Laws of 1901, § 379) and before that, its progenitor was the law in California for another fifty-one years (West's Ann.Penal Code § 415; Cal.Stats. 1850, Ch. 99, § 112).

■ Concededly the ancientness of a statute is not dispositive of its constitutionality but it is a fact to be considered in determining the public's awareness of its existence and general knowledge of the conduct which it proscribes. The California Supreme Court, although negating a petitioner's conviction on the grounds of faulty jury instructions, upheld that state's statute against the same charges as are here levelled at our statute:

"Section 415 is not unconstitutionally vague and overbroad. It has a commonly understood meaning that not only affords adequate notice of the type of conduct that is proscribed, but also precludes its application to conduct protected by the First Amendment. The part of the section under which petitioner was convicted provides: 'Every person who maliciously and willfully disturbs the peace or quiet of any * * * person * * * by tumultuous or offensive conduct * * * is guilty of a misdemeanor.' The terms 'disturb the peace' and 'breach of the peace,' which are substantially synonymous, have long been understood to mean disruption of public order by acts that are themselves violent or that tend to incite others to violence. Thus, one may be guilty of disturbing the peace within that part of section 415 if he engages in 'tumultuous' conduct, i. e., violent conduct that wilfully and maliciously endangers public safety or order. He may also be guilty of disturbing the peace through 'offensive' conduct if by his actions he wilfully and maliciously incites others to violence or engages in conduct likely to incite others to violence. (People v. Cohen (1969) 1 Cal.App.3d 94, 101, 81 Cal.Rptr. 503.)" In Re Bushman, 1 Cal. 3d 767, 83 Cal.Rptr. 375, 463 P.2d 727.

Of course the principle of "Fairplay" underlying the Due Process Clause will not condone the drafting of a penal law which is so vague and uninformative that the general public cannot glean what evil the legislature intended to guard against; or only guess at what conduct falls within the pale of its prohibition. On the other hand

to enunciate the statute with the degree of definiteness sought by the defendant would require specific definitions of each term which would no doubt necessitate further definitions of the definitions, ad infinitum —so that each section of the criminal code would be a thesaurus of definitions, synonyms and examples. Neither the United States Constitution, the constitutions of the several states, nor even the Magna Carta could withstand the severity of this test.

In conjunction with the claim that the statute is vague and overbroad, the defendant contends that it also "brings within its scope speech which is constitutionally protected" by the First Amendment to the United States Constitution. He places particular emphasis on the term "obscene" which has stubbornly resisted a scientific definition for decades.[1] But we are not here faced with the complexities of the sexual connotation of "obscene" as used in obscenity statutes and applied to literature or the theater. Here the term is used to describe a type of "epithet"; in other words an obscene adjective, a vulgarity, a profanity or, in plain terms—"cuss words". It would be inane to apply the constitutional standard of Roth, infra, Footnote 1, to determine if it appealed to prurient interests and even more ridiculous to seek in such activity a redeeming social value, much less any intellectual support for a protagonist's argument.

The value of such speech and its exclusion from constitutional protection were set forth in Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 769, 86 L.Ed. 1031, 1035:

"Allowing the broadest scope to the language and purpose of the Fourteenth Amendment, it is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words— those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly out-weighed by the social interest in order and morality. 'Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.' Cantwell v. Connecticut, 310 U.S. 296, 309, 310, 60 S.Ct. 900, 906, 84 L.Ed. 1213, 128 A.L.R. 1352."

It is with equal disbelief that we treat the argument that the other enumerated disorderly acts in A.R.S. § 13-371 have the blessing and encouragement of the Constitution. It is inconceivable that the First Amendment grants to anyone an "inalienable right" to wilfully and maliciously traverse the peace and quiet of his fellow citizens, by conduct which—to name but a few—is described by the statute as "loud, offensive, threatening, fighting" or by use of words which are "violent, abusive or obscene epithets." Actions such as these are not an exercise of rights but rather are an abuse of rights and entails a gross lack of understanding—or calloused indifference—to the simple fact that the offended parties also have certain rights under the same Constitution.

The proponents of new ideals, social changes and radical concepts of conduct may not employ methods of advancing their arguments by means which do violence to our concepts of government by the people rather than by anarchy. It is not impossible that their ideas may have some merit, but their methods leave so much to be desired that the principles they advocate are tainted by their means of bringing it to the atten-

---

1. See Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498.

tion of the responsible public. Quoting from Professor Thomas I. Emerson:

"Many persons do not easily separate the conduct or threatened conduct of those who express unwanted ideas from their expression of hated and feared opinions. Thus opposition to the conduct, or to the potential conduct, readily merges into suppression of opinion. The irresistible drive is not only to oppose the action sought by the minority group but to suppress their advocacy of it. Frequently prosecution of unpopular opinion is used as a screen for opposing necessary social change. And often the limitation becomes a weapon in a political struggle, employed primarily for partisan advantage.

"Finally, in analyzing limitations on freedom of expression, there must be taken into account the whole impact of restriction on the healthy functioning of a free society. Limitations are seldom applied except in an atmosphere of public fear and hysteria. This may be deliberately aroused or may simply be the inevitable accompaniment of repression." Emerson, The Dynamics of Limitation, 72 Yale L.J. 877.

This court need not marshal an array of authorities for the statement that the right of freedom of expression must be jealously guarded. But safeguarding one right does not justify absolute permissiveness, particularly by the judiciary, to the extent that the exercise of such right is done at the expense of infringement upon the rights of others.

"Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument."

* * * * * *

"In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy.

"The essential characteristic of these liberties is, that under their shield many types of life, character, opinion and belief can develop unmolested and unobstructed. Nowhere is this shield more necessary than in our own country for a people composed of many races and of many creeds. There are limits to the exercise of these liberties. The danger in these times from the coercive activities of those who in the delusion of racial or religious conceit would incite violence and breaches of the peace in order to deprive others of their equal right to the exercise of their liberties, is emphasized by events familiar to all. These and other transgressions of those limits the state appropriately may punish." Cantwell et al. v. Connecticut, 310 U.S. 296, 310, 60 S.Ct. 900, 906, 84 L.Ed. 1213.

When a person, or group of persons, inextricably weave their concepts into a web of violent conduct, masquerading as constitutional persuasion, the remainder of society is forced to either reject their ideas or to accept their methods. Since the former is more acceptable, the result is usually greater limitations on freedom of speech.

Somewhere a point must be reached where courts must draw a line between free and proper use of expression and an unrestrained abuse of the rights of others under the guise of constitutionally protected speech. We have here reached that point.

John Jay, who was first Chief Justice of the United States Supreme Court and prominent in formulating the principles of our government, in a charge to a grand jury as a federal judge, stated:

"Civil liberty consists, not in a right to every man to do just what he pleases, but it consists in an equal right to all the citizens to have, enjoy, and do, in peace, security, and without molestation, whatever the equal and constitutional laws of the country admit to be consistent with the public good." Lewis, Great American Lawyers, Vol. 1, p. 284 (The John C. Winston Co.).

This court does not recognize the right of people to do as they please regardless of the rights of others.

■ Accordingly we are of the opinion that A.R.S. § 13–371 is not an unconstitutional infringement of rights guaranteed by the First Amendment. Therefore the question certified; "Does the amended complaint charge the defendant with an offense?" is answered in the affirmative.

LOCKWOOD, C. J., STRUCKMEYER, V. C. J., and UDALL and HAYS, JJ., concur.