529 P.2d 236

**The STATE of Arizona, Appellee,**

v.

**Christine Virginia BRAHY, Appellant.**

**No. I CA–CR 691.**

Court of Appeals of Arizona,
Division 1,
Department A.

Dec. 10, 1974.

As Amended Dec. 12, 1974.

Rehearing Denied Jan. 7, 1975.

Review Denied Feb. 11, 1975.

Donofrio, P. J., dissented and filed opinion.

N. Warner Lee, Atty. Gen. by Frank T. Galati, Asst. Atty. Gen., Phoenix, for appellee.

Goldman & Bendheim by Theodore D. Mote, Phoenix, and Eugene M. Kadish, Tempe, for appellant.

OPINION

OGG, Judge.

Appellant-defendant Christine Virginia Brahy challenges the constitutionality of A.R.S. § 13–371 as impinging upon her First Amendment rights; on this basis she seeks to set aside her conviction for disorderly conduct. The statute reads:

"*Article* 15. *Disorderly Conduct*

§ 13–371. Disturbing the peace; methods; punishment

A. A person is guilty of a misdemeanor who maliciously and wilfully disturbs the peace or quiet of a neighborhood, family or person by:

1. Loud or unusual noise.

2. Tumultuous or offensive conduct.

3. Threatening, traducing, quarreling, challenging to fight or fighting.

4. Applying any violent, abusive or obscene epithets to another.

B. A person who violates this section shall be punished by a fine not exceeding two hundred dollars, or by imprisonment in the county jail for not to exceed two months."

The complaint charged defendant with violating § 13–371, subsection A(4) in that she maliciously and wilfully disturbed the peace and quiet of "the people at the airport by violent, abusive, obscene epithets to another." The facts gleaned from the transcript are: Defendant sought to enter the boarding area at the Phoenix airport, but when she was told that her purse would have to be analyzed by the x-ray machine she turned around and left. Approximately 5 minutes later she returned and gave her bag to one of the women operating the x-ray machine. After walking through the magnetometer she was informed that a hand search of her purse was necessary because an object contained within it could not be identified by the x-ray procedure. Defendant then slammed her purse down on the table and went toward the boarding gate. Several minutes later, as she was returning toward the x-ray machine and table, she saw that her purse was being searched, and she began screaming from a distance of approximately 25 feet, "What are you fucking sons of bitches a-doing in my purse?" The remarks were directed at the women assigned to check the purse. This was repeated six to eight times. Approximately 20 people were around the x-ray machine. The arresting officer tried to calm her, but the defendant said, "You fucking son of a bitch, I will spit in your face." After spitting on the officer, defendant was placed under arrest. In a trial to the court defendant was convicted and now brings this appeal.

In the case of State v. Starsky, 106 Ariz. 329, 475 P.2d 943 (1970), our Arizo-

na Supreme Court ruled upon the question presented in this appeal. The Court held that A.R.S. § 13–371 was not an unconstitutional infringement upon those rights guaranteed by the First Amendment. The Court of Appeals cannot overrule or modify a decision of our Supreme Court. McKay v. Industrial Commission, 103 Ariz. 191, 438 P.2d 757 (1968); State v. Shahan, 17 Ariz.App. 148, 495 P.2d 1355 (1972). It is appellant's position that State v. Starsky, supra, is no longer the law of Arizona because of subsequent United States Supreme Court decisions.

In Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), and in Gooding v. Wilson, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972), the United States Supreme Court struck down a portion of the "disturbing the peace" statutes in California and Georgia. The Court found the statutes too broad when they included as a violation any conduct that was offensive to public sensibilities. The Court, however, did follow the guidelines of Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), and held that certain classes of speech such as profane, insulting or "fighting" words, which by their very utterance tend to incite an immediate breach of the peace, are not protected free speech under the First Amendment. The statute must be drawn or interpreted to include, as a violation, only those epithets amounting to "fighting words."

We believe that our Arizona Supreme Court in Starsky narrowed the interpretation of A.R.S. § 13–371 to make it fall within the accepted guidelines of the Chaplinsky, Cohen and Gooding decisions and that this narrowed interpretation frees the statute from any constitutional infirmity. In Starsky the Court narrowed the definition of "disturbing the peace" through "offensive" conduct to mean wilfully and maliciously inciting others to violence or engaging in conduct likely to incite others to violence. In our opinion the conduct of the defendant in this case was likely to incite others to violence.

The utterances by the defendant in this case are not an essential part of the exposition of ideas and are of such slight social value that any benefit derived from them is clearly outweighed by the social interest in peaceful and nonoffensive conduct. A statement by the Court in Starsky has equal application here: "Actions such as these are not an exercise of rights but rather are an abuse of rights and entail a gross lack of understanding—or calloused indifference—to the simple fact that the offended parties also have certain rights under the same Constitution." 106 Ariz. at 333, 475 P.2d at 946.

The judgment and sentence are affirmed.

STEVENS, J., concurs.

DONOFRIO, Presiding Judge (dissenting).

I find it necessary to respectfully dissent from the majority's analysis, for it is my opinion that State v. Starsky, 106 Ariz. 329, 475 P.2d 943 (1970) has not ruled upon the question of this appeal and that the reasoning of Starsky has been changed by subsequent United States Supreme Court decisions. It is a rule of this jurisdiction that when subsequent interpretations of the United States Constitution by the U. S. Supreme Court render the position of the Arizona Supreme Court untenable, this Court is free to analyze its decision in light of those subsequent interpretations. State v. New Times, Inc., 20 Ariz.App. 183, 511 P.2d 196 (1973).

In part Starsky relied upon the California Supreme Court decision of In re Bushman, 1 Cal.3d 767, 83 Cal.Rptr. 375, 463 P. 2d 727 (1970) which interpreted California's disorderly conduct statute (which was essentially similar to ours) as constitutional. This reliance now appears misplaced in light of the U. S. Supreme Court's reversal of People v. Cohen, 1 Cal.App.3d 94, 81 Cal.Rptr. 503 (1969), in Cohen v. Calif., 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284, (1971), the decision of Gooding v. Wilson, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408

(1971) and the memorandum cases of Brown v. Oklahoma, 408 U.S. 914, 92 S.Ct. 2507, 33 L.Ed.2d 326 (1972) and Lewis v. New Orleans, 408 U.S. 913, 92 S.Ct. 2499, 33 L.Ed.2d 321 (1972).

The Court's first examination of the problem of offensive language came in Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). The court summed up its position in the memorable language of the following passage:

"There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words —those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." (footnotes omitted) 314 U.S. at 571–572, 62 S.Ct. at 769.

The Court was espousing the viewpoint that the social value of indecent talk as a step toward the truth was clearly outweighed by the social interests in order and morality. This viewpoint has considerably changed, yet it is this viewpoint that Starsky mainly relies upon. I am unable to find within the Starsky decision the basis by which the majority concludes:

"In Starsky the Court narrowed the definition of 'disturbing the peace' through 'offensive' conduct to mean wilfully and maliciously inciting others to violence or engaging in conduct likely to incite others to violence."

The Starsky opinion declares:

"Actions such as these [referring to the conduct described by the statute] are not an exercise of rights but rather are an abuse of rights and entails a gross lack

of understanding—or calloused indifference—to the simple fact that the offended parties also have certain rights under the same Constitution."

The decision also quotes from Thomas I. Emerson, The Dynamics of Limitation, 72 Yale L.J. 877:

"Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument."

The Starsky opinion fails in any way to give guidance as to how our statute must be interpreted to be constitutionally permissible. It does not narrow the definition of subsection A(4) of our disturbing the peace statute to include only that language which can be classified as "fighting words."

In analyzing the trend the U. S. Supreme Court has espoused, the model they have utilized dates back to the Chaplinsky decision where they weighed the value of offensive speech against the harms caused by such speech. The Court by defining free speech as only that speech which contributed to the improvement of society and the communication of which was a step toward the determination of truth, clearly indicated that offensive language had a non-existent value in accomplishing this purpose. This philosophical approach seemed to change, however, in Winters v. New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948) where the Court recognized that First Amendment protection was not restricted to the exposition of ideas. In this case defendant had been convicted of selling crime magazines in violation of a statute prohibiting as obscene the publication of stories of bloodshed, lust or crime. The Court concluded that expression devoid of ideas but with entertainment value was protected because "[t]he line between the informing and entertaining is too elusive for the protection of the basic [First Amendment] right . . . What is one man's amusement, teaches another's doc-

trine." Winters, supra, at 510, 68 S.Ct., at 667. The result of this decision was to view the free speech protection as going beyond the exposition of ideas and away from the guidelines of Chaplinsky. See also Terminiello v. Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949) where the Court indicated that there the behavioral assumption between speech and reactive conduct is not always applicable in cases of incitive speech.

The Chaplinsky decision pointed to two harmful consequences of offensive language. These are "(1) [to] inflict injury or (2) tend to incite an immediate breach of the peace." 315 U.S. at 572, 62 S.Ct. at 769. The first involves the prevention of injury emotional in nature and injury to "sensibilities" of auditors. The interest in sensibilities is an internal reaction, subjective in character, and essentially immeasurable. The second interest falls within the category of "fighting words" or language prompting violent physical conduct. It is manifested externally, somewhat objective, and thus measurable. This distinction of the potentially harmful results of offensive language was first noted in Cohen v. California, supra, where the Court made clear that offending the sensibilities of onlookers or members addressed by the speaker did not create a significant threat of violence. Cohen v. California, supra, at 403 U.S. 23, 91 S.Ct. 1780. The Court was thus indicating a change in position from Chaplinsky where it took the position that law is incapable of controlling physical responses to offensive language by proscribing the use of inciting words. It recognized in Cohen that "words are often chosen as much for their emotive as for their cognitive force." 403 U.S. at 26, 91 S.Ct. at 1788. In addition, it noted that the emotive function "may often be the more important element of the overall message sought to be communicated." 403 U.S. at 26, 91 S.Ct. at 1788. The Court was apprehensive of its inability to draw the line between offensive language and other language, stating ". . . it is nevertheless often true that one man's vulgarity is an-

other's lyric." 403 U.S. at 25, 91 S.Ct. at 1788. There thus results a danger of punishing vulgarities which in fact result in the punishment of lyrics. The Court quite significantly noted that the behavioral assumption linking speech with reactive conduct was appropriate only in the Chaplinsky context of fighting words uttered in a *face-to-face* confrontation. It could be argued that the Court was taking the approach that the proper method to control violent reaction is to punish the reaction rather than the words. In my estimation this would be wise policy for it is essential that law inhibit and thwart the opportunities for violence in society. Words should never be a catalyst for violent conduct.

Any doubts as to whether offensive language could be punished because of its offensiveness to sensibilities was clearly put to rest in Gooding v. Wilson, supra. The Court noted that in Chaplinsky the statute had been upheld because it had been clearly construed to prohibit only that language which was likely to cause an immediate violent response by the addresser of the offensive words. Significantly, several of the Georgia decisions construing their breach of peace statute included as a violation of offense to public sensibilities. See e. g. Samuels v. State, 103 Ga.App. 66, 67, 118 S.E.2d 231, 232 (1961). This approach has been fermented in the memorandum case of Rosenfeld v. New Jersey, 408 U.S. 901, 92 S.Ct. 2479, 33 L.Ed.2d 321 (1972), Lewis v. New Orleans, supra, and Brown v. Oklahoma, supra. In Rosenfeld, the defendant was convicted for uttering the word "motherfucking" on four occasions in a speech at a public school board meeting. Although in 1970 the New Jersey Supreme Court had limited the coverage of their statute to words "of such a nature as to be likely to incite the hearer to an immediate breach of the peace or to be likely . . . to affect the sensibilities of a hearer", State v. Profaci, 56 N.J. 346, 353, 266 A.2d 579, 584 (1970), the Court remanded the case to the New Jersey court in light of Cohen and Gooding. Upon rehearing the New Jersey Superior Court

concluded that the State's fear of harm was largely dependent on a concern for sensibilities. State v. Rosenfeld, 120 N.J.Super. 458, 459, 460, 295 A.2d 1, 2 (Super.Ct.App. Div.1972). It therefore concluded that the statute was overbroad.

In considering subsection A(4) of A.R.S. § 13–371, I likewise conclude that this section without further interpretation is unconstitutional, for its language allows its application to those instances when offensive language offends the sensibilities of general auditors. The facts of the case before us reveal that no "fighting words" were spoken in a face-to-face confrontation. Although the disrespect shown toward the police officer when defendant said, "You fucking son of a bitch, I will spit in your face" may be reprehensible, an officer is trained to react professionally to the comments made. Because these words would not ordinarily provoke a violent reaction by a policeman, they cannot be considered "fighting words." This principle was recognized in Williams v. District of Columbia, 136 U.S.App.D.C. 516, 419 F.2d 638, at 646 fn. 23 (1969) when it quoted from the Model Penal Code:

> "Insofar as the theory of disorderly conduct rests on the tendency of the actor's behavior to provoke violence in others, one must suppose that policemen, employed and trained to maintain order, would be least likely to be provoked to disorderly responses." Model Penal Code § 2501, Comment [4(C)] at p. 14 (Tentative Draft No. 13 (1961)).

See also Lewis v. City of New Orleans, supra.

Furthermore, I am of the opinion that the statements addressed to the ladies assigned to check the purse were not "fighting words". The day is long past when the reactive conduct expected or even suspected would be a violent physical reaction when one woman addresses another woman in an obscene and abusive epithet. This particularly would be so when the woman addressed is in a position trained to deal with the public, responsible for the safety

of aircraft travelers and accustomed to searching the privacies of boarding passengers. Are we to assume that our society is composed of thin-skinned individuals ready to strike back at the hint of an abusive epithet? No longer are the words of the rough, coarse and uncivilized confined to their likes. They are part of the working vocabulary of many in our society. To be a member of our society is to be familiar with them, to overhear them used and endure whatever offensiveness it might cause so long as the situation is not one in which the words become a call to combat. I fail to see the likelihood of fisticuffs in the present situation.

It therefore must be concluded that appellant's conviction rested upon her offensive language overheard by those in the vicinity. To rest her conviction upon this basis is constitutionally impermissible. I do not mean to intimate by this holding that we condone the conduct of appellant in this matter. Each person within our society has the obligation and responsibility to be respectful and considerate of the sensibilities and morals of those with whom he may have contact. Although not each individual will be able to abide by this unwritten law of an orderly and peacefully coexistent society, that should not act as a deterrent in protecting First Amendment interpretation of freedom of speech. The difficulties of creating statutes which can produce fine line-drawing as to what is constitutionally protected speech have been previously pointed out in other decisions. See Starsky, supra. Similarly, the inability to create meaningful distinctions from carefully drafted statutes has led the judiciary to the current position of granting greater protective freedom of speech

rights. The dilemma, which has been resolved in favor of the expansion of speech constitutionally protected, is the difficulty of proscribing unprotected speech and avoiding the punishment of protected speech along with it. Because of the present impossibility of formulating both legislative and judicial tools to solve this dilemma, the Court in this area now approaches the matter with a presumption seemingly in favor of constitutional protection for all speech. I agree in this viewpoint, for freedom of speech and its protection has been thought of as the root of man's liberty and freedom in our society. It is a right too dear to the preservation of democracy to tamper with unwisely. Therefore only the most judicious infringements of speech can be allowed.

Because as it now stands, A.R.S. § 13–371(A)(4) would allow for the punishment of speech which offends the sensibilities of unaddressed auditors, I find it unconstitutional as applied. I emphasize that this decision does not regard this section as being unconstitutional per se, but only that appellant's conviction rested upon an unconstitutional interpretation of that language. In light of Gooding v. Wilson, supra, I have indicated the construction of this section which is necessary in order that it be considered as constitutionally sound. Simply put, offensive language heard by general auditors is constitutionally protected speech and as such cannot be the subject of an arrest as in the instant case. Only offensive language used in face-to-face confrontation which is likely to incite a violent reaction ("fighting words") can be constitutionally punished.

I therefore would reverse the matter.