**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Lewis Leonard SIMPSON, Defendant-Appellant.**

**No. 77–1108.**

United States Court of Appeals, Seventh Circuit.

Argued June 6, 1977.

Decided July 29, 1977.

Rehearing Denied Sept. 30, 1977.

54

Richard Kammen, Indianapolis, Ind., for defendant-appellant.

James B. Young, U.S. Atty., John L. Hudgins, Asst. U.S. Atty., Indianapolis, Ind., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, TONE, Circuit Judge, and DECKER, District Judge.*

TONE, Circuit Judge.·

Defendant Simpson used the citizens band radio transmitter in his home to broadcast explicit references to sexual activities, descriptions of sexual and excretory organs, and abusive epithets directed to other radio operators with whom he was communicating, all in street vernacular. His broadcasts were received not only on citizens band radio but on AM radio, television, and telephones. We must decide whether he was properly convicted of violating 18 U.S.C. § 1464, which makes it an offense to "utters . . . obscene, indecent, or profane language by means of radio communication," when the jury found his language was "indecent" but not "obscene." (The court ruled that "profanity" was not involved.)

The CB radio transmitter was licensed to Simpson's former wife, who, although divorced from him, had lived in his home until about three months before he made the first of a series of transmissions, only one of which was the subject of the § 1464 charge. Both he and she used the transmitter while they lived together, and there is no evidence that she had ever forbidden him to use it. The second issue in this case is whether he was properly convicted of knowingly and wilfully broadcasting without a license in violation of 47 U.S.C. §§ 301 and 501.

Simpson was sentenced to imprisonment for one year on the § 1464 count and six months, to be served concurrently with the one year, on each of six § 501 counts.

I.

█ The District Court withdrew from the jury the issue of whether the language was profane, submitting forms of verdict which permitted them to decide the issues of obscenity and indecency, as defined by the court, separately. The jury's determination in its guilty verdict that the broadcast was "indecent" but not "obscene" requires us to decide whether those two words, as used in the statute, have different meanings.[1]

In his instructions to the jury the district judge first defined "obscene" in accordance with *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), and then defined "indecent." The only difference between the two definitions was that the first element of the *Miller* definition, "appeal to the prurient interest in sex," 413 U.S. at 24, 93 S.Ct. at 2615, was omitted in the definition of indecent.[2]

█ Given the ordinary meaning of the words in the phrase "obscene, indecent, or profane," the disjunctive "or," the presumption against redundancy, and the apparent purpose of the provision, which was to make radio broadcasts acceptable in the home, it was not unreasonable for the District Court to impute to Congress an intent

---

* The Honorable ʼBernard M. Decker, District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

1. We would have had no difficulty in affirming a finding that the language was obscene, but we are of course bound by the jury's contrary finding.

2. The instruction read:
"Language is 'indecent' if you find that:
"(1) taken as a whole, the language broadcast describes, in a patently offensive way, as determined by contemporary community standards, sexual conduct, such as normal or perverted sexual acts, masturbation or excretory functions, and

"(2) the language broadcast, taken as a whole, lacks serious literary, artistic, political or scientific value.
"If any of the above elements are not satisfied, then the language broadcast, no matter how offensive, is not indecent. For language to be considered 'indecent' it need not be shown to the appeal to the prurient interest."
In so defining "indecent," the District Court apparently adopted the suggestions of several judges of the Court of Appeals of the D. C. Circuit. See *Illinois Citizens Committee for Broadcasting v. FCC*, 169 U.S.App.D.C. 166, 515 F.2d 397, 403–404 n. 14 (1974)(as amended in 1975); *cf. Pacifica Foundation v. FCC*, 556 F.2d 9 (D.C. Cir., 1977).

to use "indecent" in the sense stated in the instruction. Section 1464, however, must be interpreted in the light of its statutory surroundings and the history of judicial interpretation of the word "indecent" in other similar federal statutes, which apparently were not called to the attention of the district judge.

Section 1464, which ·is entitled, "Broadcasting obscene language," appears with four other sections in Chapter 71 of Title 18 of the United States Code, which is entitled, "Obscenity." The other four sections prohibit, in the words of their titles, "Mailing obscene or crime-inciting matter" (§ 1461), "Importation or transportation of obscene matters" (§ 1462), "Mailing indecent matter on wrappers or envelopes" (§ 1463), and "Transportation of obscene matters for sale or distribution" (§ 1465). In each of these sections, as in § 1464, the word "indecent" is used in conjunction with other adjectives, at least one of which is invariably "obscene." Thus the maxim of construction *noscitur a sociis* is not irrelevant.

■ There is a difference between the context in which "indecent" is found in § 1464 and its context in each of the other four sections in chapter 71. In § 1464 the word has only two companion adjectives, "obscene" and "profane." Quite clearly "profane," which is not found in any other section of the chapter, was intended to mean something different from "obscene," see *Duncan v. United States*, 48 F.2d 128, 133–134 (9th Cir.), *cert. denied*, 283 U.S. 863, 51 S.Ct. 656, 75 L.Ed. 1468 (1931),[3] and we might expect that "indecent" was also. On the other hand, we would ordinarily expect a word found in each of five sections comprising a chapter of the United States Code to mean the same thing wherever it appears in the chapter. To resolve the ambiguity we must look beyond the statute.

The history of the federal statutes bearing on obscenity is described in *Manual Enterprises, Inc. v. Day*, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962), at 483–484 n.5, 82 S.Ct. at 1434 (opinion of Harlan, J.) and at 500–511, 82 S.Ct. at 1443–1449 (opinion of Brennan, J.). See also *id.* at 521–523, 82 S.Ct. at 1454–1455 (opinion of Clark, J., dissenting). Most of the cases arose under the mailing statute, now § 1461. In *Swearingen v. United States*, 161 U.S. 446, 450–451, 16 S.Ct. 562, 563, 40 L.Ed. 765 (1896), the Court held that the words "obscene, lewd and lascivious" in the predecessor to § 1461 described a single offense, and signified "that form of immorality which has relation to sexual impurity . . . [and is] . . . calculated to corrupt and debauch the minds and morals . . . .." Later decisions held that the words "indecent, filthy or vile" in that section are qualified by the preceding words "obscene, lewd and lascivious," and that all refer to matters of sex and connote prurient appeal. See *Flying Eagle Publications, Inc. v. United States*, 273 F.2d 799, 803 (1st Cir. 1960), *aff'd after remand*, 285 F.2d 307, 308 (1st Cir. 1961). Mr. Justice Harlan, in his *Manual Enterprises* opinion, 370 U.S. at 482–484, 82 S.Ct. at 1434, said of those six words used in § 1461,

> "While in common usage the words have different shades of meaning, the statute since its inception has always been taken as aimed at obnoxiously debasing portrayals of sex. Although the statute condemns such material irrespective of the *effect* it may have upon those into whose hands it falls, the early case of *United States v. Bennett*, 24 Fed.Cas. 1093 (no. 14571), [Cir.Ct., S.D.N.Y. 1879 (three judges)] put a limiting gloss upon the statutory language: the statute reaches

---

**3.** Held to be profane in that case was language of a radio broadcast in which the defendant "referred to an individual as 'damned,' . . . used the expression 'By God' irreverently, and . . . announced his intention to call down the curse of God upon certain individuals . . . ." 48 F.2d at 134. Compare *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952). And compare the

language of *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), quoted in *Joseph Burstyn, Inc. v. Wilson, supra*, 343 U.S. at 506 n.20, 72 S.Ct. 777, with *Cohen v. California*, 403 U.S. 15, 22–26, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). See also *Tallman v. United States*, 465 F.2d 282, 286 (7th Cir. 1972), and n.7, *infra*.

only indecent material which as now expressed in *Roth v. United States* [354 U.S. 476 (1957)] at 489 [77 S.Ct. 1304 at 1311, 1 L.Ed.2d 1498] 'taken as a whole appeals to prurient interest.'" (Footnotes omitted and emphasis in original.) [4]

This passage was quoted with approval by the Court in *Hamling v. United States,* 418 U.S. 87, 112, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974).

The phrase "obscene, indecent, or profane" in § 1464 originated in § 29 of the Radio Act of 1927, ch. 169, 44 Stat. 1162, 1173. Nothing in the legislative history of that Act explains the word "indecent" or indicates that it was intended to have a meaning different from that which it bears in other similar statutes. [5] The only relevant passages, which appear in the transcripts of the hearings, indicate that "obscenity" was the concern of those members of Congress who spoke and that the statute regulating the mailing of obscene matter, now § 1461, was thought to be a pertinent analog. [6]

In construing § 29 of the Radio Act in *Duncan v. United States, supra,* the Ninth Circuit relied upon the decisions interpreting the predecessors of § 1461. That body of law led the court to conclude that the language used by the defendant in that case, although "vulgar, scurrilous, and indecent in the popular sense of the term . .

is not obscene or indecent within the meaning of those terms as universally applied in the administration of the criminal law," because the test was prurient appeal:

"The test is as to whether or not the language alleged to be obscene would arouse lewd or lascivious thought in the minds of those hearing or reading the publication."

48 F.2d at 132.

The few cases subsequent to *Duncan* which deal with the meaning of "indecent" in § 1464, without much discussion of the question of interpretation and none of the long history of the construction of the word in the cases under the mailing statute, decide or assume that "indecent" has a meaning different from that of "obscene." Thus, in *Gagliardo v. United States,* 366 F.2d 720, 725 (9th Cir. 1966), the court held that the language charged was not obscene because it was not likely to appeal to the prurient interest or "arouse the animal passions, but rather was made during a moment of anger," but reversed for a new trial for failure to instruct on the meaning of "indecent." The court read *Duncan* as not equating indecent with obscene without explaining its rationale for this interpretation. *Id.* at 725 n.7. This court, in two cases decided in 1972, dealt with the word "indecent" in § 1464. *Tallman v. United*

---

**4.** Compare, however, as to the word "filthy," *United States v. Limehouse,* 285 U.S. 424, 426–427, 52 S.Ct. 412, 76 L.Ed. 843 (1932).

**5.** The legislative history is rather meager. Section 1464 originated as § 29 of the Radio Act, and was carried over to § 326 of the Communications Act of 1934, ch. 652, 48 Stat. 1064, 1091, without substantive change. S.Rep.No. 781, 73d Cong., 2d Sess. 8 (1934). Compare 44 Stat. 1173 with 48 Stat. 1091. With the overall revision and codification of Title 18, accomplished by the Act of June 25, 1948, ch. 645, 62 Stat. 683, 769, the last sentence of § 326 became the present 18 U.S.C. § 1464. See § 21, 62 Stat. 862, 866.

**6.** *To Regulate Radio Communication: Hearings on H. R. 5589 Before the House Committee on the Merchant Marine and Fisheries,* 69th Cong., 1st Sess. 40 (Jan. 6, 1926)(Representatives Reid and Davis); *To Regulate Radio Communication: Hearings on H. R. 7357 Before the House Committee on Merchant Marine and Fisheries,*

68th Cong., 1st Sess. 178–179 (Mar. 13, 1924)(colloquy among Representatives McKeown, Davis, Bland, and Larsen and Mr. David Sarnoff of RCA). See also a speech before the Fourth Annual Radio Conference by then-Secretary of Commerce Herbert Hoover, reprinted in the *Hearings on S. 1 and S. 1754 Before the Senate Committee on Interstate Commerce,* 69th Cong., 1st Sess. 56 (Jan. 9, 1926). Section 29 (see n.5, *supra*) was not discussed in the House or Senate reports or during the floor debates. Obscenity and the rights of listeners not to hear it were adverted to, in passing, during hearings on the access of members of the Jehovah's Witnesses sect to the radio broadcasting system. See *Hearings on H. R. 7986 Before the House Committee on Merchant Marine Radio, and Fisheries,* 73d Cong., 2d Sess. 173–174 (Mar. 20, 1934)(Statement of Mr. Henry A. Bellows, Vice-President of CBS).

*States,* 465 F.2d 282, 285–286 (7th Cir. 1972); *United States v. Smith,* 467 F.2d 1126, 1130 (7th Cir. 1972). In *Tallman,* in which the government contended only that the language charged was obscene, not indecent or profane, the court rejected a challenge to the facial validity of the statute grounded in the vagueness of "indecent" and "profane." [7] In *Smith,* the jury had also been instructed that, even though the indictment charged "obscene, indecent, or profane" language, "the gist of the offense alleged . . . is . . . that the defendant broadcast obscene language." The court, reversing for failure to instruct on scienter, stated that the evidence "would have more appropriately supported a conviction under standards of profanity or indecency rather than obscenity as defined in *Roth v. United States,* 354 U.S. 476, [77 S.Ct. 1304, 1 L.Ed.2d 1498]" and therefore, in the event of a retrial, the court should either instruct the jury "that the defendant may not be convicted of uttering a profane or indecent radio broadcast" or define the terms "profane" and "indecent" for the jury. 467 F.2d at 1130. As in *Gagliardo, supra,* on which the court relied, no definition of "indecent" was attempted. Although it is inferable that in *Smith* the court thought "indecent" meant referring to matters of sex but not calculated to appeal to the prurient, this is not necessarily so with respect to *Tallman.* There the

court's rejection of the argument that "indecent" was unconstitutionally vague, 465 F.2d at 285–286, was based on the passage in *Roth v. United States,* 354 U.S. 476, 491–492, 77 S.Ct. 1304, 1312, 1 L.Ed.2d 1498 (1957), in which the Court was construing that word as it appeared in the phrase "obscene, lewd, lascivious, or filthy . . . or other publication of an indecent character" in § 1461 and "obscene or indecent" in the California obscenity statute before the Court. These phrases were construed in that case, as they had been in others, to require an appeal to the prurient. *Roth v. United States, supra,* 354 U.S. at 487–492, 77 S.Ct. 1304.

A development subsequent to *Tallman* and *Smith* is in our opinion, decisive of the issue before us. The word "indecent" is defined in dictum in footnote 7 of *United States v. 12 200-Ft. Reels of Super 8 MM. Film,* 413 U.S. 123, 130, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973), one of the companion cases to *Miller* in which the *Miller* standards were held applicable to federal legislation. In that footnote the Court, after acknowledging the rule that, when a serious question concerning the constitutionality of a federal statute is raised, the statute should be construed in such a manner as to avoid that question, if it is fairly possible to do so, added the following:

---

7. In *Tallman* the court construed "profane" as "denoting language which under contemporary community standards is so grossly offensive to members of the public who actually hear it as to amount to a nuisance." 465 F.2d at 286. This definition, derived from Judge McGowan's opinion in *Williams v. District of Columbia,* 136 U.S.App.D.C. 56, 419 F.2d 638, 646 (1969), describes conduct of the kind defined as "indecent" by the District Court's instructions in the case at bar. The nuisance rationale for regulation of offensive speech may not survive. See *Cohen v. California, supra,* 403 U.S. at 23–26, 91 S.Ct. 1780; *Carey v. Population Service Int'l,* 431 U.S. 678, 97 S.Ct. 2010, 2025, 52 L.Ed.2d 675 (1977). Compare *Gooding v. Wilson,* 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972), with *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 210–211 n.6, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); but see *Rosenfeld v. New Jersey,* 408 U.S. 901, 905–909, 92 S.Ct. 2479, 33 L.Ed.2d 331 (1972) (Powell, J., dissenting); *Von*

*Sleichter v. United States,* 153 U.S.App.D.C. 169, 472 F.2d 1244, *cert. denied,* 409 U.S. 1063, 93 S.Ct. 555, 34 L.Ed.2d 517 (1972). See also *Redrup v. New York,* 386 U.S. 767, 769, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967). Compare *Smith v. United States,* 431 U.S. 291, 97 S.Ct. 1756, 1772–1773 nn. 16–20, 52 L.Ed.2d 324 (1977) (Stevens, J., dissenting). The Court has recently observed that even protected speech may be subjected to various types of governmental regulation, depending upon the content of the communication and the context in which it is made. *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 66–72, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976); *Virginia State Board of Pharmacy v. Virginia Citizens Consumers Council, Inc.,* 425 U.S. 748, 770–773, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). A problem under the "specificity" aspect of the *Miller* decision may also arise. 413 U.S. at 27–28, 93 S.Ct. 2607. See also *Ward v. Illinois,* 431 U.S. 767, 97 S.Ct. 2085, 52 L.Ed.2d 738 (1977).

"If and when such a 'serious doubt' is raised as to the vagueness of the words 'obscene,' 'lewd,' 'lascivious,' 'filthy,' 'indecent,' or 'immoral' as used to describe regulated material in 19 U.S.C. § 1305(a) and 18 U.S.C. § 1462, see *United States v. Orito* [413 U.S. 139], at 140 n. 1 [93 S.Ct. 2674, 2676 n. 1, 37 L.Ed.2d 513], we are prepared to construe such terms as limiting regulated material to patently offensive representations or descriptions of that specific 'hard core' sexual conduct given as examples in *Miller v. California* [413 U.S. 15], at 25 [93 S.Ct. 2607, 2615, 37 L.Ed.2d 419]. See *United States v. Thirty–seven Photographs* [402 U.S. 363 (1971)] at 369–374 [91 S.Ct. 1400, 28 L.Ed.2d 822], (opinion of White, J.). Of course, Congress could always define other specific 'hard core' conduct."

413 U.S. at 130 n. 7, 93 S.Ct. at 2670. The passage of *Miller* referred to in the footnote lists "a few plain examples of what a state statute could define for regulation under part (b) of the standard announced in this opinion . . . ." *Miller, supra*, 413 U.S. at 25, 93 S.Ct. at 2615. Part (b) of the *Miller* standard is "whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law," *id.* at 24, 93 S.Ct. at 2615, but the standard has two other elements which the Court stated are also necessary to make the utterance subject to regulation. The first of these is: "(a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest . . . ." *Id.* Thus, read with the passage from *Miller* to which it refers, footnote 7 of *12 200-Ft. Reels* states that "indecent" will be construed as exempting from First Amendment protection only material which appeals to the prurient interest, *i. e.*, material that is obscene. In *United States v. Orito*, 413 U.S. 139, 145, 93 S.Ct. 2674, 2679, 37 L.Ed.2d 513 (1973), the Court referred to footnote 7 and *Miller* as the "standards . . . for distinguishing obscene material, unprotected by the First Amendment, from protected free speech," and held them applicable to § 1462. Footnote 7 was also quoted with approval and held applicable to § 1461, although without specific reference to the word "indecent" or prurient appeal, in *Hamling v. United States, supra*, 418 U.S. at 113–114, 94 S.Ct. 2887.

■ Although the Court did not refer in footnote 7 to 18 U.S.C. § 1464, the statute before us, and although the constitutional doubt may be less serious with respect to radio broadcasts [8] than it would be with

8. The Supreme Court has observed on several occasions that "[e]ach medium of expression . . . must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975), citing *Joseph Burstyn, Inc. v. Wilson, supra*, 343 U.S. at 503, 72 S.Ct. 777. For example, compare *Brandywine-Main Line Radio, Inc. v. FCC*, 153 U.S.App.D.C. 305, 473 F.2d 16 (1972), *cert. denied*, 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973), with *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). See also *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 386–390, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

There is, of course, a long history of government regulation of radio communications, *NBC v. United States*, 319 U.S. 190, 210–217, 63 S.Ct. 997, 87 L.Ed. 1344 (1943), going back to the Radio Act of 1912, 37 Stat. 302. In *Red Lion, supra*, 395 U.S. at 397 n. 23, 89 S.Ct. 1794, the Court specifically noted that CB users had First Amendment rights, but commented that their rights could be limited, and cited with approval two court of appeals decisions upholding FCC regulations which barred CB users from "engaging in radio communications as a hobby or diversion . . . ." 47 C.F.R. § 95.-83(a)(1), quoted in *Lafayette Radio Electronics Corp. v. United States*, 345 F.2d 278, 280 (2d Cir. 1965). Accord, *California Citizens Band Ass'n v. United States*, 375 F.2d 43 (9th Cir.), *cert. denied*, 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967). See also *Gross v. FCC*, 480 F.2d 1288, 1292 n. 7 (2d Cir. 1973). As the Court has cautioned repeatedly, however, "the basic principles of freedom of speech . . . do not vary." *Joseph Burstyn, Inc. v. Wilson, supra*, 343 U.S. at 503, 72 S.Ct. at 781.

The potential for conflict between the First Amendment rights of the speaker and the privacy interests of the listening audience has been recognized since the inception of radio broadcasting, see, *e. g.*, the *Hearings* cited in note 6, *supra*, and has been explicitly recognized by the Supreme Court. See *CBS v. Democratic National Committee*, 412 U.S. 94, 101–

respect to § 1462's application to materials transported in interstate commerce,[9] we must assume that the Court would interpret "indecent" in § 1464 as it has in § 1462. *Cf. Hamling v. United States, supra*, 418 U.S. at 115, 94 S.Ct. 2887. This conclusion is consistent with the interpretation given the word "indecent" in the cases under § 1461 and its predecessors at a time when any constitutional doubt as to that section was not viewed as a serious problem, and it has the virtue of according the same meaning to the word wherever it is used in the chapter of Title 18 of the United States Code entitled "Obscenity."

■ We therefore hold that "obscene" and "indecent" in § 1464 are to be read as parts of a single proscription, applicable only if the challenged language appeals to the prurient interest. Our holding makes it unnecessary to reach the question of whether the First Amendment protects, against federal criminal sanctions, a radio broadcast made in the crude sex vernacular of the street that is patently offensive but lacks prurient appeal. It is also unnecessary to consider various alleged trial errors relating to the § 1464 count. As to that count (Count 1) we reverse and enter a judgment of acquittal.

## II.

The jury found Simpson guilty under six additional counts (2 through 6 and 10),[10] each charging that he "knowingly and wilfully did operate and broadcast a radio transmission in and affecting interstate commerce, when he was not licensed to so broadcast by the Federal Communications Commission as required by" 47 U.S.C. § 301, in violation of § 501 of that title. While one of the broadcasts charged was the same one charged in the § 1464 count, the contents of the others were not before the jury, and content was irrelevant to the § 501 charges. Simpson argues that the evidence was insufficient to establish the violations charged in these counts.

102, 127–128, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973); *Red Lion, supra*, 395 U.S. at 390, 89 S.Ct. 1794. The balancing of these values has given the Court difficulty. Compare *e. g., Saia v. New York*, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948), with *Kovacs v. Cooper*, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949), regarding restrictions applicable to the use of other artificial devices enhancing or amplifying speech. As part of this balancing process, the Court has distinguished between the protection accorded privacy interests in public places and in one's own home. This distinction has importance in a variety of contexts. See, *e. g., Public Utilities Commission v. Pollak*, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952); *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). Compare *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), with *United States v. Reidel*, 402 U.S. 351, 91 S.Ct. 1410, 28 L.Ed.2d 813 (1971). In *Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), the Court upheld restrictions on political advertising in public transport vehicles on the rationale that a "captive audience" need not be subjected to such advertising. Compare *Cohen v. California, supra*, 403 U.S. at 21–22, 91 S.Ct. 1780 (public building). In *Rowan v. United States Post Office Dept.*, 397 U.S. 728, 738, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970), the Court emphasized that, although we are often subjected to sights and sounds we might prefer to avoid, as part of the price of modern society, we are not required to be "captives" in "the sanctuary of the home."

Of course, as Mr. Justice Brandeis observed in *Packer Corp. v. Utah*, 285 U.S. 105, 110, 52 S.Ct. 273, 275, 76 L.Ed. 643 (1932), "[t]he radio can be turned off." Similarly, Mr. Justice Harlan's opinion in *Cohen v. California, supra*, 403 U.S. at 21, 91 S.Ct. 1780, emphasized that offended persons could avoid embarrassing visual displays "simply by averting their eyes." It does not seem appropriate, however, that the listeners should always be required to give up their right to use their radio receivers. Indeed, in the case at bar the listeners would have also been required to forego use of their AM radios, television sets, and telephones, for the defendant's broadcasts were also received on those appliances. At some point the balance between the speaker and listener must tip in favor of the listener, but where that point is we need not decide, in view of our interpretation of the statute.

**9.** 19 U.S.C. § 1305(a), the importation statute actually before the Court in *12 200-Ft. Reels*, which was referred to with § 1462 in footnote 7, does not contain the word "indecent."

**10.** The court renumbered the remaining counts after dismissing original Counts 1 through 4. Thus what are now referred to as Counts 2 through 10 were originally Counts 6 through 14. The jury acquitted Simpson on Counts 7 through 9.

The CB radio license was issued to Simpson's former wife at their joint home, from which she departed four months before the broadcasts began. Although she testified at the trial that she did not give Simpson permission to use the transmitter after her departure, there was no evidence that she or anyone else ever told him that he no longer had such permission. The broadcast charged in one of the six counts was made after she surrendered the license by certified mail on April 15, 1976.

47 U.S.C. § 301 states as follows:

" . . . No person shall use or operate any apparatus for the transmission of . . . communications or signals by radio . . . except . . . with a license . . . granted under the provisions of this chapter."

Section 501 of that title makes it an offense to do

"willfully and knowingly . . . any act, matter, or thing . . . prohibited or declared to be unlawful"

by § 301, *inter alia.*

There is some confusion, if not ambiguity, in these provisions. Section 301 prohibits using or operating a transmitter without a license granted under the provisions of the Act. There is room for doubt as to whether the section refers to an operator's license or a station license, or both. See *Campbell v. United States*, 167 F.2d 451, 453 (5th Cir. 1948). Inasmuch as the Act itself does not state when a license is required, we must look to the regulations issued by the Federal Communications Commission. When Simpson made five of the six broadcasts for which he was convicted, these regulations provided, in former 47 C.F.R. § 95.97(a), that no operator license was required for the operation of a CB radio, except for

stations manually transmitting Morse Code. The Commission deleted this provision on April 13, 1976, sixteen days before the final broadcast, for the reason that it was "possible mistakenly to interpret § 95.97(a) as permitting . . . operation of a transmitter in the Citizens Radio Service without a license of any sort." The Commission further explained that its action deleted "superfluous and misleading material." [11]

Another section of the regulations, 47 C.F.R. § 95.87, which has not been amended, provides that a CB transmitter must be under the control of the licensee at all times; that he may not transfer the operating authority under the license and is responsible for the proper operation of the station; and that the station may be operated only by the licensee or members of his immediate family living in the same household. This section could be read as directed to the station licensee and intended to govern his conduct under the license. Thus, even when the sixth broadcast was made, after deletion of the "misleading" § 95.-97(a), it was not altogether clear that a reader of the statute and the regulations would understand it to be a criminal offense for one not the licensee or a member of the licensee's immediate family living in the same household to operate a licensed CB station.

An even more serious problem arises from the requirement of 47 U.S.C. § 501 that the acts be done "willfully and knowingly." These terms are defined in the standard federal jury instructions, which the district judge gave in this case:

" . . . the term 'wilfully,' . . . means that the acts were committed by the defendant voluntarily, with knowledge that they were prohibited by law,

---

11. 41 Fed.Reg. 15413–15414 (April 13, 1976), effective April 14, 1976. The full text of the explanation is as follows:

"4. When read in isolation, we believe it is possible mistakenly to interpret § 95.97(a) as permitting both operation of a transmitter in the Citizens Radio Service without a license of any sort, although a station license is required by § 95.11 of the Rules, and transmission of telegraphy in the Citizens Radio Ser-

vice, a practice not normally authorized by § 95.47 of the rules.

"5. In order to clarify the existing Rules that a valid station authorization is required for operation of a transmitter in the Citizens Radio Service and that telegraphy is not normally an authorized emission mode, we are hereby deleting § 95.97(a) of the rules in its entirety."

and with the purpose of violating the law, and not by mistake, accident, or in bad faith.

"The term 'knowingly,' . . . imports knowledge of the act or thing done, as well as an evil intent or a bad purpose in doing such thing. Ordinarily the use of the word 'knowingly' in a criminal action is to insure that no one would be convicted by an act done because of mistake or inadvertence or other innocent reason."

These definitions are consistent with the authorities. As to "wilfully," see *United States v. Murdock*, 290 U.S. 389, 394, 54 S.Ct. 223, 78 L.Ed. 381 (1933); *United States v. Pomponio*, 429 U.S. 10, 12, 97 S.Ct. 22, 50 L.Ed.2d 12 (1976); *United States v. Winston*, 558 F.2d 105 (2d Cir. 1977), at 107, 109. As to "knowingly," see *Ryan v. United States*, 314 F.2d 306, 310–311 (10th Cir. 1963); *Tallman v. United States, supra*, 465 F.2d at 287–288. Assuming that reckless disregard of the requirements of the law would be sufficient to constitute wilfullness under this statute, see *United States v. Murdock, supra*, 290 U.S. at 394–395, 54 S.Ct. 223; *United States v. Kaye*, 556 F.2d 855 (7th Cir. 1977), at 863, which would mean that it is enough if "a reasonable man would [have been] aware that [his] conduct would likely be illegal," *id.*, quoting from *United States v. Keegan*, 331 F.2d 257, 262 (7th Cir.), *cert. denied*, 379 U.S. 828, 85 S.Ct. 57, 13 L.Ed.2d 37 (1964),[12] and also assuming that the jury had been so instructed, the evidence would nevertheless have been insufficient to establish the element of *mens rea*.

■ We have here no "voluntary, intentional violation of a known legal duty." *United States v. Pomponio, supra*, 429 U.S. at 12, 97 S.Ct. at 23. There is no evidence that Simpson had actual knowledge of the regulations. Nor was there evidence from which the jury could infer that, so far as the alleged violations of the licensing regulation are concerned, Simpson broadcast "with a bad purpose" and "without ground for believing it [was] lawful" or with "careless disregard whether or not [he had] the right so to act." *United States v. Murdock, supra*, 290 U.S. at 394–395, 54 S.Ct. at 225. We think it cannot be said that a reasonable man would be aware that he was forbidden to broadcast with a CB transmitter which had been purchased by him, was licensed to his former wife at their joint home, and remained there with the license still in effect after she left their home. (With respect to the final broadcast, made after his wife had surrendered the license, there is no evidence that he was notified of the surrender of the license.) This is not a situation in which the actor should know from the nature of the prohibited act that it was likely to create danger or produce deleterious results, as in *United States v. International Minerals & Chemical Corp.*, 402 U.S. 558, 564–565, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971). The mere broadcast from a licensed station would be no more likely to produce such a result when the person broadcasting is not the licensee or a member of the licensee's immediate family living in the household than when he is.

The convictions under Counts 2 through 6 and 10 are accordingly also reversed, and a judgment of acquittal is entered on those counts.

REVERSED.

---

12. In both *Keegan* and *Kaye* the reasonable man test was applied by the court as a matter of law in affirming a conviction.